2004 ND 71

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Stephanie Jonell GUSCETTE, Defendant and Appellant.**

**No. 20030177.**

Supreme Court of North Dakota.

April 13, 2004.

Lisa K. Fair McEvers, Assistant State's Attorney, Fargo, ND, for plaintiff and appellee; submitted on brief.

Mark A. Beauchene, Wold Johnson, Fargo, ND, for defendant and appellant; submitted on brief.

KAPSNER, Justice.

[¶ 1] Stephanie Guscette appealed from a conviction for possession of drug paraphernalia. We hold there is sufficient competent evidence fairly supporting the trial court's findings that Guscette had not been seized under the Fourth Amendment when she allowed a law enforcement officer to search her vehicle and that she voluntarily consented to the search of her vehicle and a purse in the vehicle. We affirm.

I

[¶ 2] At about 8 p.m. on February 4, 2003, Fargo Police Officer Kyle Olson stopped a vehicle driven by Guscette for a broken taillight. Olson approached Guscette's vehicle, informed her why she had been stopped, and asked for her driver's license. Olson verified Guscette had a valid driver's license, and when he returned to the vehicle, he engaged her in further conversation about automobile insurance and the whereabouts of Corey Mock. Olson ultimately asked Guscette to step out of her vehicle. After Guscette stepped out of the vehicle, Olson engaged her in further conversation about Mock and a previous encounter she had had with law enforcement officers. He ultimately informed her that he was giving her a warning and she was free to leave. Before Guscette got back into her vehicle, however, Olson asked her if she had any weapons, needles, knives, or anything else illegal in the vehicle. Guscette responded she did not, and Olson then asked her for permission to search the vehicle, which she granted. Guscette and a passenger were directed to the back of the vehicle with another officer while Olson searched the vehicle. Olson found a black purse in the front seat. Upon opening the purse, Olson found drug paraphernalia. According to Olson, after he found the drug paraphernalia, he heard Guscette tell the other officer she had consented to a search of the vehicle, but not the purse. According to Guscette, Olson found the drug paraphernalia after she objected to him searching her purse.

[¶ 3] Guscette was charged with possession of drug paraphernalia. She moved to suppress evidence seized during the search of her purse. The trial court de-

nied Guscette's motion to suppress, concluding Olson was authorized to ask Guscette to search the vehicle even though the initial stop was merely for a traffic violation. The court concluded Olson was not required to have a reasonable and articulable suspicion of any other wrongdoing to ask Guscette for permission to search the vehicle. The court also concluded Guscette's consent to search the vehicle was voluntary under the totality of the circumstances, and Olson did not exceed the scope of her consent.

## II

[¶ 4] Guscette appealed from the order denying her motion to suppress. Guscette's attempted appeal from the order denying her motion to suppress is not authorized by N.D.C.C. § 29-28-06. After the denial of her motion to suppress, however, Guscette entered a conditional guilty plea to the charge of possession of drug paraphernalia in which she, the State, and the trial court acknowledged she had reserved the right on appeal to review of the adverse ruling on her motion to suppress, and a judgment of conviction was entered. Because the record contains a subsequently entered judgment consistent with the order denying Guscette's motion to suppress and the State and the trial court approved the reservation of her right to appeal, we treat Guscette's appeal from the suppression order as an appeal from the judgment. *State v. Keilen,* 2002 ND 133, ¶¶ 7–9, 649 N.W.2d 224.

## III

[¶ 5] When reviewing a trial court's ruling on a motion to suppress, we defer to the court's findings of fact and resolve conflicts in the evidence in favor of affirmance. *State v. Tognotti,* 2003 ND 99, ¶ 5, 663 N.W.2d 642. We will affirm a trial court's disposition of a motion to suppress unless, after resolving conflicting evidence in favor of affirmance, there is insufficient competent evidence fairly capable of supporting the trial court's findings, or the decision is contrary to the manifest weight of the evidence. *Id.* Our deferential standard of review recognizes the importance of a trial court's opportunity to assess the credibility of the witnesses. *State v. Fields,* 2003 ND 81, ¶ 6, 662 N.W.2d 242.

### A

[¶ 6] Guscette argues her continued detention after the time necessary to complete the initial traffic stop violated her Fourth Amendment right to be free from an unreasonable seizure. Guscette concedes the initial stop of her vehicle for a traffic violation was proper, and once a traffic violation has occurred and a traffic stop made, an officer may temporarily detain a traffic violator at the scene of the violation. Guscette contends, however, Olson's conduct after the time necessary to complete the traffic stop constituted an illegal seizure under the Fourth Amendment. She argues the facts and circumstances did not give Olson a reasonable suspicion she was engaged in criminal activity, and her consent to search the vehicle following the illegal seizure was tainted.

[¶ 7] The Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, protects individuals from unreasonable searches and seizures. *Tognotti,* 2003 ND 99, ¶ 7, 663 N.W.2d 642. In *Fields,* 2003 ND 81, 662 N.W.2d 242, this Court discussed an issue similar to the one raised by Guscette. There, in the context of a concededly valid traffic stop for expired license tabs, a police officer asked Fields for consent to search his vehicle after the officer had released him from the incidents of the traffic stop and reap-

proached him to inquire about drugs or weapons in the vehicle. *Id.* at ¶ 4. When Fields refused to consent to a search of his vehicle, the officer detained him until a drug detection dog arrived at the scene and detected drugs in the vehicle. *Id.* In *Fields,* 2003 ND 81, ¶¶ 8–13, 662 N.W.2d 242, a majority of this Court outlined standards for a traffic stop and concluded the continued detention of Fields until a drug detection dog arrived constituted a seizure under the Fourth Amendment because a reasonable person in Fields' position would not have felt free to leave the scene:

> When conducting a traffic stop, an officer can temporarily detain the traffic violator at the scene of the violation. *See State v. Mertz,* 362 N.W.2d 410, 412 (N.D.1985) (citing N.D.C.C. §§ 39–07–07 and 39–07–09). The constitutionality of an investigative detention is judged under the framework established in *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), requiring that an investigative detention be "reasonably related in scope to the circumstances which justified the interference in the first place." This Court has explained that for traffic stops, "[a] reasonable period of detention includes the amount of time necessary for the officer to complete his duties resulting from the traffic stop." *Mertz,* at 412. Those duties, according to the Court of Appeals for the Eighth Circuit, may include:
>
>> request[ing] the driver's license and registration, request[ing] that the driver step out of the vehicle, request[ing] that the driver wait in the patrol car, conduct[ing] computer inquiries to determine the validity of the license and registration, conduct[ing] computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and mak[ing] inquiries as to the motorist's destination and purpose.
>
> *United States v. Jones,* 269 F.3d 919, 924 (8th Cir.2001). The investigative detention may continue "as long as reasonably necessary to conduct these activities and to issue a warning or citation." *Id.* at 925; *see also Mertz,* at 412 ("[A] traffic violator is subject to the arresting officer's authority and restraint until the officer completes issuance of the traffic citation and expressly releases the violator.").

In this case, the officer issued Fields a citation for the expired tabs and expressly released Fields by saying goodbye, turning around, and starting to walk back to his vehicle. After the officer issued the traffic citation, the legitimate investigative purposes of the traffic stop were completed. *See Jones,* 269 F.3d at 925 (stating that once the trooper had determined that the driver was not tired or intoxicated, had verified that the driver's license and registration were valid, and had checked for any outstanding arrest warrants, the legitimate investigative purposes of the traffic stop were completed).

. . . .

Once the purposes of the initial traffic stop are completed, a continued seizure of a traffic violator violates the Fourth Amendment unless the officer has a reasonable suspicion for believing that criminal activity is afoot. *See Jones,* 269 F.3d at 925. Therefore, the constitutional inquiry in this case is reduced to two determinations: whether Fields was "seized" within the meaning of the Fourth Amendment when he was held awaiting the arrival of the drug detection dog, and if so, whether there was a reasonable suspicion to support the seizure. *See id.*

[¶ 8] Our inquiry first focuses on whether Olson seized Guscette when he asked to search her vehicle. Not every law enforcement contact with a citizen is a seizure, and law enforcement officers do not violate the Fourth Amendment merely by approaching individuals on the street or in other public places. *United States v. Drayton,* 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). In *Drayton,* at 201, 122 S.Ct. 2105, the United States Supreme Court explained that as long as law enforcement officers do not induce cooperation by coercive means, they may pose questions and ask for consent to search even when they have no basis for suspecting criminal activity. A seizure does not occur simply because a law enforcement officer questions a person, and as long as reasonable persons would feel free to disregard the officer and go about their business, the encounter is consensual and a reasonable suspicion of criminal activity is not required. *Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). If reasonable persons would feel free to terminate the encounter, they have not been seized under the Fourth Amendment. *Drayton,* at 201, 122 S.Ct. 2105. To constitute a seizure, an officer must in some way restrain an individual's liberty by physical force or show of authority. *City of Fargo v. Ovind,* 1998 ND 69, ¶ 7, 575 N.W.2d 901. In *Fields,* 2003 ND 81, ¶ 11, 662 N.W.2d 242, we have said a person has been seized within the meaning of the Fourth Amendment, if, in view of all the surrounding circumstances, a reasonable person would have believed he or she was not free to leave the scene.

[¶ 9] The trial court found Olson gave Guscette a verbal warning, handed Guscette her driver's license, and told her she was free to leave. According to Olson's written uniform incident report, which was before the trial court by incorporation into the State's return to Guscette's motion to suppress and was referred to by Olson during his testimony at the suppression hearing, Olson gave Guscette a verbal warning for the taillight, returned her identification, told her she was free to leave, and she indicated she understood. Before Guscette returned to her vehicle, Olson asked her if she had any weapons, needles, knives, or anything else illegal in the vehicle, and she replied she did not. Olson then asked Guscette for consent to search her vehicle, which she granted. This is not a case where Olson detained Guscette while a drug detection dog was called to the scene. Rather, after Olson told Guscette she was free to leave, he asked her about items in the vehicle and asked her for permission to search her vehicle. Nothing in the record indicates this exchange required anything more than a minimal period of time, and Guscette testified she was not "nervous or anything" during her encounter with Olson. The trial court found Olson told Guscette she was free to leave before Olson asked for consent to search the vehicle, and there was no threat or show of force by Olson when he asked for consent to search the vehicle. The court found Guscette consented to the search "right after receiving her driver's license back and being told she was free to go." The trial court effectively found Guscette had not been seized when she consented to the search of her vehicle.

[¶ 10] We conclude there is sufficient competent evidence supporting the trial court's finding Guscette was free to leave and had not been seized when she consented to the search of her vehicle, and the court's decision is not contrary to the manifest weight of the evidence. We, therefore, conclude Guscette was not seized under the Fourth Amendment when she consented to the search of her vehicle.

B

[¶ 11]   In *City of Fargo v. Ellison*, 2001 ND 175, ¶ 13, 635 N.W.2d 151, we outlined our standard for determining the validity of a consent to search:

"[W]hen the validity of a consent to search is called into question, the trial court must satisfy itself that the consent was given voluntarily before it can permit the use of evidence obtained from the search against the accused at trial." *State v. Discoe*, 334 N.W.2d 466, 467 (N.D.1983). "[T]he way in which the trial court is to make its determination on the issue of voluntariness is by examining the totality of the circumstances which surround the giving of a confession or consent to a search to see whether it is the product of an essentially free choice or the product of coercion." *Id.* "Under a 'totality of the circumstances' standard, although the existence or absence of certain factors concerning (1) the characteristics and condition of the accused at the time [he or she] confessed or consented and (2) the details of the setting in which the consent or confession was obtained are significant in deciding voluntariness, no one factor in and of itself is determinative." *Id.* at 467–68.

[¶ 12]   The trial court found Guscette voluntarily consented to the search of her vehicle under the totality of the circumstances. Guscette testified she was not nervous during her encounter with Olson. The court found there was no threat or show of force by Olson when Guscette consented to the search, and nothing in this record supports a conclusion Guscette's consent was the product of coercion. The court's findings and conclusions are supported by the record and are not contrary to the manifest weight of the evidence.

[¶ 13]   In *State v. Schmitz*, 474 N.W.2d 249, 251 (N.D.1991), this Court discussed the scope of a consent to search:

To be valid as an exception to the warrant and probable cause requirements of the Fourth Amendment, a consent search must be "conducted according to the limitations placed upon an officer's right to search by the consent." *State v. Huether*, 453 N.W.2d 778, 782 (N.D.1990). "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The question whether a search exceeds the scope of consent is a factual one, subject to the "clearly erroneous" standard of review. *Huether*, 453 N.W.2d at 782; *State v. Padgett*, 393 N.W.2d 754, 757 (N.D.1986).

[¶ 14]   In *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), the United States Supreme Court said a defendant's general consent to search a car includes a consent to search containers within the vehicle which may contain the items sought. The trial court found Olson asked Guscette for consent to search the vehicle after asking her if there were any weapons, knives or anything else illegal in the vehicle. Guscette's purse was in the vehicle, and weapons or knives are items that could be found in a purse. The court found Guscette put no limitations on her initial consent to search the vehicle, and by the time Guscette may have withdrawn her consent, the contraband had already been discovered. That finding is supported by Olson's testimony he had already found the drug paraphernalia when he heard Guscette telling the other officer she had not consented to a search of her purse, but just to the search of the vehicle. Although Guscette testified she did not believe Olson had found drug paraphernalia in her purse when she objected to the other officer, there is evidence sup-

porting the trial court's finding. We conclude there is sufficient competent evidence fairly supporting the trial court's findings of consent and those findings are not contrary to the manifest weight of the evidence.

### IV

[¶ 15]   We affirm Guscette's conviction.

[¶ 16] DALE V. SANDSTROM and WILLIAM A. NEUMANN, JJ., concur.

MARING, Justice, dissenting.

[¶ 17]   I dissent from the majority because I believe that Guscette was illegally detained and that the trial court did not appropriately consider the issue of consent obtained after an illegal detention.   I would reverse and remand for the trial court to properly apply the law.

### I

[¶ 18]   The record of this case establishes that Officer Olson stopped Guscette for a broken taillight.   He approached the driver's door and asked Guscette for her North Dakota driver's license.   He proceeded back to his squad car where he ran a driver's license check to confirm that Guscette did have a valid driver's license. Upon checking the in-house computer, he saw that Guscette had prior involvements with drugs and paraphernalia.

[¶ 19]   Officer Olson walked back to Guscette's vehicle and asked her for proof of insurance.   Guscette had difficulty locating the current proof of insurance, and the officer did not require her to produce it. Next, Officer Olson asked Guscette if she knew the whereabouts of Corey Mock. Corey Mock was a roommate of Guscette, whom she knew law enforcement had been trying to locate.   Guscette told the officer she did not know the whereabouts of Corey Mock.

[¶ 20]   Officer Olson then asked Guscette to step out of her vehicle to visit with him.   She agreed and got out of her vehicle.   Officer Olson again asked Guscette if she knew the whereabouts of Corey Mock. She again stated she did not know.   The officer then asked her about contact she had with Officer Erbes concerning a drug charge.   Guscette said she still had to go to court on that matter.   The record is unclear whether, at this point or just before questioning her about her drug charge, the officer told Guscette that he was going to give her a verbal warning and handed back her identification.

[¶ 21]   The trial court found, and the majority agrees, that the officer then told Guscette she was free to leave.   Neither Officer Olson nor Guscette testified to this fact at the suppression hearing. The only place this fact can be found is in Officer Olson's report of the arrest which was referred to in the State's response to the motion to suppress.

[¶ 22]   Before Guscette was able to get back into her car, Officer Olson asked her if she had any weapons, needles, knives, or anything else illegal in her vehicle.   She answered no.   He then asked her if he could search her vehicle.   She said yes.

### II

[¶ 23]   I believe that continuing to detain Guscette for questioning after her license and registration had been checked was a violation of the Fourth Amendment. *See United States v. Ramos,* 42 F.3d 1160, 1164 (8th Cir.1994) (holding that continuing to detain defendants after their licenses and registration had been checked was a violation of the Fourth Amendment).

[¶ 24]   "To justify a greater intrusion unrelated to the traffic stop, the totality of circumstances known to the officer must meet the requisite level of reasonable sus-

picion under *Terry."* *United States v. Ramos,* 20 F.3d 348, 352 (8th Cir.1994), *rev'd on other grounds,* 42 F.3d 1160 (8th Cir. 1994). After a lawful stop, an officer is entitled to order the driver and the passenger out of the vehicle to check the identity and validity of the license of the driver, to check the identity of the passenger, to request the driver sit in the patrol car, to ask the driver about his destination and purpose, to ascertain whether there are outstanding arrest warrants on the driver or passenger, and to establish whether the vehicle is stolen or otherwise involved in violations of the law. *Ramos,* 20 F.3d at 353 (Beam, J., dissenting) (citations omitted); *United States v. Jones,* 269 F.3d 919, 924 (8th Cir.2001). The United States Court of Appeals for the Eighth Circuit has further stated:

> If reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions. If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop.

*Ramos,* at 1163.

[¶ 25] In my opinion, Officer Olson's extended detention after completing the traffic stop was an unreasonable seizure and violated the Fourth Amendment. Officer Olson conducted a driver's license and registration check, a check of Guscette's criminal history, and an insurance check. At that point, he had done everything necessary to complete the traffic stop investigation and did not have reasonable or articulable suspicion of further criminal activity.

[¶ 26] Although Officer Olson had all the information he needed to complete the traffic stop investigation, he asked Guscette the whereabouts of Corey Mock and then asked her to exit. her vehicle. Once out of her vehicle, Officer Olson pursued his interrogation concerning the whereabouts of Corey Mock, Guscette's pending drug charge, and the status of the drug charge. Although it is not clear exactly when he returned her identification, gave her a verbal warning, and, supposedly, told her she was free to leave, it was definitely after he asked her to exit her vehicle and after questions about Corey Mock's whereabouts. The record does not reveal that Officer Olson asked Guscette any questions relevant to the traffic. stop during their conversation outside of her. vehicle. Officer Olson's questions were unrelated to the .traffic stop and were unreasonable. He had no justification to expand the scope of ·the traffic stop· beyond investigating Guscette for a broken taillight.

[¶ 27] The State contends, however, following issuance of the verbal warning and return of Guscette's identification that she could have merely gotten in her car and left. In this case, Officer Olson had just finished interrogating Guscette concerning the whereabouts of her roommate whom law enforcement was trying to locate and possibly about her own drug charge when he told her she was free to leave. Then, in the next breath, he asked if she had any illegal drugs in her vehicle and if he could search it. If Officer Olson told her she was free to leave and then contemporaneously interrogated her about her own drug charges, her consent was the fruit of an illegal detention. *See State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762 (1997). I am of the opinion that at the time of her consent she was either still seized or seized a second time when the officer interrogated her about her own drug charge.

## III

[¶ 28] If Guscette was still seized or seized a second time, the consent she subsequently gave to search her vehicle was tainted by her illegal detention. The State contends Guscette voluntarily consented to a search of her vehicle after being told she could leave. Our Court has stated the standard for determining the voluntariness of a consent to search includes examining the totality of the circumstances:

"Under a 'totality of the circumstances' standard, although the existence or absence of certain factors concerning (1) the characteristics and condition of the accused at the time [he or she] confessed or consented and (2) the details of the setting in which the consent or confession was obtained are significant in deciding voluntariness, no one factor in and of itself is determinative."

*City of Fargo v. Ellison*, 2001 ND 175, ¶ 13, 635 N.W.2d 151 (quotation omitted). In this case, the trial court concluded, after applying the above standard, Guscette's consent was voluntary. However, this is not the end of the inquiry. *See United States v. Becker*, 333 F.3d 858, 861 (8th Cir.2003).

## A

[¶ 29] In *Wong Sun v. United States,* the Supreme Court of the United States held that statements made following an illegal detention are not admissible. 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The United States Court of Appeals for the Eighth Circuit has held that the rule announced in *Wong Sun* applies in circumstances such as in the present case, where evidence is obtained in a search following an illegal detention. *Ramos,* 42 F.3d at 1164 (stating "[t]he giving of Miranda warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibili-ty") (citing *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

[¶ 30] The United States Court of Appeals for the Eighth Circuit has held that although a trial court finds a driver, who was illegally detained, subsequently consents voluntarily to a search, that is not the end of the inquiry. *Becker,* 333 F.3d at 861. Rather, the Court of Appeals concludes a trial court must analyze a second question, whether the consent to search was "sufficiently an act of free will to purge the taint of the preceding illegal detention." *Ramos,* 42 F.3d at 1164; *see Becker,* at 862.

[¶ 31] In determining whether a "consent [to search] was given in circumstances that render it an independent, lawful cause of [the] discovery of [the relevant evidence]" and whether the taint of an illegal detention is purged from the evidence seized, the following factors must be considered:

(1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *see also [United States v.] Moreno,* 280 F.3d [898,] 900 [(8th Cir.2002)] (applying the *Brown* factors).

*Becker,* 333 F.3d at 861–62 (footnote omitted). The Court of Appeals further stated that a trial court must apply the *Brown* factors to determine whether a voluntary consent to search retains the taint of the illegal detention. *Becker,* at 861.

[¶ 32] In *Ramos,* the United States Court of Appeals for the Eighth Circuit, on a petition for rehearing, held that despite the illegal detention of Ramos, his consent was "sufficiently an act of free will to purge the taint of the preceding illegal detention." 42 F.3d at 1164. In that case,

the Court of Appeals noted the officer told the driver, both orally and in writing, that he did not have to sign the consent form. The Court of Appeals further noted such a warning is not required by law; therefore, the fact the officer gave the warning strongly suggested he was not attempting to exploit the traffic stop, but was acting in good faith. *Id.* The defendant signed a consent form, and the Court of Appeals concluded, "[w]hat happened here, really, went beyond voluntary consent. It was an affirmative waiver of Salvador Ramos's Fourth Amendment right to prevent a search of his vehicle." *Id.*

[¶ 33] In the present case, there was no written consent form or warning, but there was an intervening circumstance between the illegal detention and the consent to search Guscette's vehicle. Officer Olson's report states that he told Guscette at some point, either before or after he interrogated her about her own drug charges, that she was free to leave before he asked if he could search her car. Officer Olson said Guscette could leave, and in the next breath, he asked her if there were drugs in her vehicle and if he could search it. Both of those questions were asked before Guscette could even get back into her car and followed on the heels of illegal questioning outside her vehicle concerning the whereabouts of her roommate whom law enforcement was trying to locate and her own pending drug charge. Professor Lafave recognizes that there exists now a pervasive police practice of using traffic stops plus purported consent of those stopped as a means of conducting vehicle searches to find drugs. 3 Wayne R. Lafave, *Search and Seizures* § 8.2 at 169 (3d ed. & Supp.2004). He notes "that traditionally the notion of voluntariness [of consent] 'has reflected an accommodation' of two competing interests: (i) the 'need for ... a tool for the effective enforcement of criminal laws'; and (ii) 'society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness.' " *Id.* at 169 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Professor Lafave concludes: "If courts sense an element of unfairness in particular consent strategies employed by the police, that itself might prompt a more critical assessment of police claims of consent in that setting." *Id.*

[¶ 34] Because the trial court failed to recognize Guscette's illegal detention, it did not address the issue of whether Guscette's consent to search her car was "sufficiently an act of free will to purge the primary taint." The trial court did discuss the intervening factor that Officer Olson told Guscette she was free to leave. However, I conclude the trial court erred by failing to analyze the other two *Brown* factors which it should have considered when determining if the taint of Guscette's illegal detention was purged.

[¶ 35] Guscette's motion to suppress stated, "[t]his Motion is made and based upon the attached Affidavit of Stephanie Jonell Guscette together with any and all evidence or testimony adduced at the hearing of this matter." At the suppression hearing, Guscette testified to the following:

Q: Okay. Did you ask him why he was detaining you like that?

A: Nope, I didn't. I didn't question it because I thought maybe he was, you know, just, you know, wanted to see if we were doing anything bad. Maybe standing face to face was a better confrontation, you know, to see if, you know, what I was like. And I wasn't nervous or anything because, you know, I hadn't been doing anything wrong. And the first thing he had said to me was, he asked me, so, you haven't seen Corey Mock? And I was like, I said,

no, I haven't seen him for several days matter of fact. And then he goes, I see you had a run-in with Officer—I believe it was Erbes, he said, you had a run-in with Officer Erbes. I was—I didn't know that my charges, you know, from being on bond and my first charge would of been on my, you know, that he could of seen that all ready. And so, I asked him if that was, you know, what I was still was going to Court for. and he—

Q: You had a previous paraphernalia charge, is that right?

A: Yeah.

Q: Okay. And somehow he had got some information—

A: Right.

Q: —that you had something to do with an Officer Erbes, is that correct?

A: Right.

Q: Do you know how he got that information?

A: I'm sure he looked in his computer or something.

Q: Okay. But, nonetheless, that didn't bother you?

A: Well, I asked him if that was, you know, what I was still going to Court for? And he told me, well yes, it must be. And I was like, well then, yeah—you know, I did have a run-in with Officer Erbes.

Q: Uh-huh.

A: And then he goes—well he goes—considering, you know, the—you know, the—what's on, you know, in front of me, he goes, can I search your car? And I—he goes can—will you give me consent to search your car? And I said, sure, you know. Then he directed Officer Nelson to ask Andy to get out of the car, which Andy did. And we stood at the back of my car. And I was on the driver's side of the car standing right at the rear, right by the light, Andy was standing right next to me. And then Officer Nelson was standing, like, right behind us. And he went to—Officer Olson went to my car. And my purse was on the front—was on the front, like, in the middle between the seats and—it's a fairly large purse—and I seen him go for it right away. And as soon as he grabbed it—

Guscette's testimony indicates the request to search for contraband was contemporaneous with Officer Olson's questioning regarding a run-in with Officer Erbes and a drug charge. Under the totality of the circumstances, an inference of coercion or intimidation could be drawn.

[¶ 36] The United States Supreme Court has rejected per-se rules and has emphasized that voluntariness is a fact question to be determined from all the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). On remand from the United States Supreme Court, the Supreme Court of Ohio in *Robinette*, 685 N.E.2d at 770–71 stated:

"The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obliged to allow." *Id.* [*State v. Robinette*], 73 Ohio St.3d [650] at 654, 653 N.E.2d [695] at 698 [(1995)].[5] When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to sub-

mit to the officer's questioning. While Newsome's questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. Even the state conceded, at oral argument before the United States Supreme Court, that an officer has discretion to issue a ticket rather than a warning to a motorist if the motorist becomes uncooperative. *See* 1996 WL 587659, at 5 (Official Transcript of Oral Argument). From the totality of the circumstances, it appears that Robinette merely submitted to "a claim of lawful authority" rather than consenting as a voluntary act of free will. Under *Royer*, this is not sufficient to prove voluntary compliance. [*Florida v.*] *Royer*, 460 U.S. [491] at 497, 103 S.Ct. [1319] at 1324, 75 L.Ed.2d [229] at 236 [(1983)].

*Robinette*, at 770–71. "Other courts have on like or similar facts also concluded that an illegal second seizure occurred after termination of a lawful one, a result not at all inconsistent with the United States Supreme Court's *Robinette* decision." *See* 4 Wayne R. Lafave, *Search and Seizure* § 9.3(a) at 49 (3d ed. & Supp. 2004); *Id.* at 50 n. 107.12–107.13. In *Reittinger v. Commonwealth*, the Supreme Court of Virginia held that, although Reittinger was told by the deputy he was free to leave after the deputy gave him a verbal warning, the events that transpired immediately thereafter, namely, questioning about drugs in his vehicle and a request for permission to search, "would suggest to a reasonable person that just the opposite was the case." 260 Va. 232, 532 S.E.2d 25, 28 (2000). The law is clear that an officer cannot exceed the scope of the traffic violation unless there is reasonable and articulable suspicion to believe criminal activity is afoot and an illegal detention taints any subsequent consent. *Jones*, 269 F.3d at 925. The law is also clear that, on the

totality of the circumstances, the consent must be found "sufficiently voluntary to purge the taint of [an] illegal detention." *Becker*, 333 F.3d at 861.

## IV

[¶ 37] I am of the opinion that, when an officer's queries exceed the scope of the traffic stop without reasonable and articulable suspicion of criminal activity, giving a verbal warning and merely uttering "you are free to leave" do not necessarily guarantee a subsequent consent to search is "sufficiently" voluntary to purge the taint of an illegal detention. This is especially true where the illegal detention and consent are integrally connected and contemporaneous and where there have been subtly coercive police questions, which possibly create a vulnerable subjective state in the person who consents.

[¶ 38] I conclude Guscette was illegally detained; therefore, a Fourth Amendment violation occurred. However, because the trial court failed to consider the illegal detention and whether Guscette's voluntary consent was sufficiently an act of free will to purge the taint of her illegal detention or whether it was the fruit of an illegal detention, I would reverse and remand for the trial court to apply the correct legal standard regarding consent following an illegal detention.

[¶ 39] Therefore, I respectfully dissent.

[¶ 40] MARY MUEHLEN MARING

VANDE WALLE, Chief Justice, dissenting.

[¶ 41] The trial court concluded this case is analogous to *State v. Everson*, 474 N.W.2d 695 (N.D.1991), and that under *Everson* the officer "was not required to have a reasonable and articulable suspicion of any further wrongdoing by Defendant in order to ask for her consent to search the vehicle." But in *Everson* the defendant

was held due to the delay in obtaining a license check on the trailer because of the mutilated condition of the license plate. It was during that delay the officer requested permission to search the automobile to which the trailer was attached.

[¶ 42] In this case, I agree with the dissent that the officer's extended detention after completing the traffic stop was an unreasonable seizure under the Fourth Amendment to the United States Constitution. The authority to stop a vehicle for a traffic violation is not authority or justification to interrogate the driver on unrelated matters. I also agree with the dissent to the extent that if the detention is illegal, we need look closely at the circumstances to determine if there was a clear interval between the illegal detention and the request to search before we conclude the permission to search was indeed voluntary notwithstanding the illegal detention. Under the totality of the circumstances in this instance, the clear interval and the voluntariness of the consent to search are not readily apparent. I join the dissent in concluding we should remand the matter to the trial court for that determination.

[¶ 43] GERALD W. VANDEWALLE, C.J.