2017 ND 282

**STATE of North Dakota, Plaintiff and Appellee**

v.

**$127,930 UNITED STATES CURRENCY, Defendant**

and

**Anoulak Thornsavan–Owner, Interested Party and Appellant**

No. 20170154

Supreme Court of North Dakota.

Filed 12/7/2017

Kimberlee J. Hegvik, Assistant State's Attorney, Fargo, North Dakota, for plaintiff and appellee.

Craig E. Cascarano (argued), Minneapolis, Minnesota, and Charles J. Sheeley (appeared), Fargo, North Dakota, for interested party and appellant.

Tufte, Justice.

[¶ 1] Anoulak Thornsavan appeals from an order denying his motion to suppress and from the civil judgment forfeiting $127,930 to the State. We affirm, concluding there was reasonable suspicion to extend the traffic stop and a *Miranda* warning was not required.

I

[¶ 2] In July 2015, Officer Mason Ware pulled over Thornsavan, along with his passenger, Saravanh Phommakhy, on Interstate 94. Ware stopped Thornsavan because it appeared to him that the car had excessive window tint. Prior to the stop, Ware checked the vehicle registration in his database, which indicated that the vehicle was registered to an individual born in 1937. Ware noted that both Thornsavan and Phommakhy looked as though they were in their late 20's or early 30's. Ware also found it significant that neither Thornsavan or Phommakhy acknowledged him as he drove alongside them; instead, they looked straight ahead.

[¶ 3] Walking toward the stopped car, Ware saw a pillow, blanket, and backpack in the backseat of the car, but not any luggage. Soon after making contact, Ware asked for licenses and registration. When Thornsavan reached into his center console to obtain his information, Ware saw a "bundle of cash" in the console with a $50 bill on top of the stack and a $20 bill on the bottom. Thornsavan then gave Ware a photocopy of the vehicle title. The photocopy indicated that the car had been purchased just four days prior. Ware testified that Thornsavan and Phommakhy appeared nervous, avoided eye contact, stuttered, and displayed tremors in their hands. Ware tested the tint of Thornsavan's driver-side window, and the test indicated a violation of the vehicle tint law. Ware asked Thornsavan to sit in his squad car, and Thornsavan complied.

[¶ 4] While in the squad car, Ware checked the licenses and registration, and inquired into Thornsavan's travel plans. Thornsavan told Ware that he and Phommakhy were driving "straight through" to Seattle to visit a friend who was going to show them around the city. Ware testified that, since the day of the stop was a Friday and Thornsavan said he was planning on returning by Monday, Thornsavan would apparently be spending only a few hours in Seattle. Thornsavan originally stated that he was returning to Minneapolis by Monday, but later said his return day would be Tuesday.

[¶ 5] Ware's questioning then turned to the recent car purchase. Ware testified that Thornsavan didn't give him a direct answer right away as to how much he paid for his car. Thornsavan changed his recollection of the sale price from $4,400 to $4,300. Ware thought this was odd since Thornsavan had just purchased the car. Additionally, the title indicated the car was purchased for $2,500. Thornsavan told Ware that he had put $2,500 as the price on the title because the seller had told him to write in any amount and Thornsavan decided to write $2,500 to avoid paying higher taxes. Next, Ware inquired into the relationship between Thornsavan and Phommakhy. Thornsavan told Ware that

the two were cousins and roommates. The addresses on their driver's licenses, however, did not match. Thornsavan also became increasingly nervous while in the squad car, especially so when Ware's computer made noises or when Ware was typing. Thornsavan asked multiple times if everything was "checking out" with the computer searches.

[¶ 6] Ware asked Thornsavan about the contents of his car just prior to issuing a warning citation. Specifically, Ware testified:

I had asked him if there was any drugs, guns, anything illegal in the vehicle, any large sums of money, which during the answering, he did—his answers were consistent up until I asked him about the large sums of money. At which point, he had stated, "No, no" twice instead of the—before he was just saying, "Oh, no," "No," and then when it came to large sums of money, he did say, "No, no."

Ware then issued Thornsavan a warning citation for the excessive tint. Ware asked Thornsavan if he would consent to a search of his vehicle. Thornsavan declined. Ware informed Thornsavan that his car would be detained until a drug dog inspected the car, but told Thornsavan he was free to leave. Thornsavan then got out of the car and sat in the ditch.

[¶ 7] Officer Jed Dahnke arrived with the drug dog, and the dog alerted on the trunk of the car. The officers searched the trunk and found two duffle bags containing vacuum-sealed blocks of cash with dryer sheets in between the sealed layers. The total cash amount found and seized by law enforcement was $127,930, which included $930 found in the center console. Thornsavan filed a motion to suppress his statements and the money found. The district court denied the motion to suppress and ordered the money to be forfeited.

II

[¶ 8] "When reviewing a trial court's ruling on a motion to suppress, we defer to the court's findings of fact and resolve conflicts in the evidence in favor of affirmance." *State v. Guscette*, 2004 ND 71, ¶ 5, 678 N.W.2d 126.

We will affirm a trial court's disposition of a motion to suppress unless, after resolving conflicting evidence in favor of affirmance, there is insufficient competent evidence fairly capable of supporting the trial court's findings, or the decision is contrary to the manifest weight of the evidence. Our deferential standard of review recognizes the importance of a trial court's opportunity to assess the credibility of the witnesses.

*Id.* (citation omitted). Questions of law are reviewed de novo. *State v. Genre*, 2006 ND 77, ¶ 12, 712 N.W.2d 624.

[¶ 9] We have stated that "traffic violations, even if considered common or minor, constitute prohibited conduct and, therefore, provide officers with requisite suspicion for conducting investigatory stops." *State v. Stadsvold*, 456 N.W.2d 295, 296 (N.D. 1990). Here, Ware observed that Thornsavan's vehicle appeared to have excessive tint when he drove next to it. On the basis of his training and experience, Ware had reasonable suspicion to stop Thornsavan. Thornsavan concedes the initial traffic stop was supported by reasonable suspicion.

III

[¶ 10] Thornsavan argues that law enforcement lacked reasonable suspicion to detain him or his car beyond the initial traffic stop and that his statements and the money seized must be suppressed in this forfeiture action.

[¶ 11] A traffic stop becomes improper if the original purpose of the stop ceases and the officer no longer has reasonable suspicion of another crime. *State v. Fields*, 2003 ND 81, ¶ 10, 662 N.W.2d 242. As this Court noted in *Adan*:

> The duration of the investigatory detention may continue as long as reasonably necessary to conduct [the officer's duties resulting from the traffic stop] and to issue a warning or citation. When the original purpose of the traffic stop is complete, the officer must have a reasonable suspicion that criminal activity is afoot to continue the detention. Any further detention, without reasonable suspicion, violates the traffic offender's Fourth Amendment rights against unreasonable searches and seizures.

*State v. Adan*, 2016 ND 215, ¶ 11, 886 N.W.2d 841 (quotations and citations omitted). "[E]vidence obtained in violation of the Fourth Amendment's protections against unreasonable searches must be suppressed as inadmissible under the exclusionary rule." *State v. Gregg*, 2000 ND 154, ¶ 23, 615 N.W.2d 515. In determining whether reasonable suspicion is present, we look at the totality of the circumstances and take into account inferences and deductions that an investigating officer would make. *Fields*, at ¶ 13.

[¶ 12] The initial stop for excessive tint ended when the citation was issued. *Id.* at ¶ 9 (concluding that after an officer issues a traffic citation, the investigative purposes of the traffic stop are complete). Although Ware told Thornsavan he was free to leave, Ware said the car would be detained until a drug dog arrived. Ware needed reasonable suspicion to seize Thornsavan's car for a dog sniff. *See State v. Hall*, 2017 ND 124, ¶¶ 19–22, 894 N.W.2d 836 (requiring reasonable suspicion to conduct a dog sniff on a seized backpack); *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (stating same requirement for seized luggage). Therefore, the issue is whether Ware had reasonable suspicion to continue seizing Thornsavan's vehicle after the citation was given.

[¶ 13] We have held that "[a]n individual's nervousness during a traffic stop is a pertinent factor in determining reasonable suspicion." *Adan*, 2016 ND 215, ¶ 15, 886 N.W.2d 841 (quotations omitted). Ware testified that throughout the stop, Thornsavan and Phommakhy appeared unusually nervous, avoided eye contact, stuttered while speaking, and appeared to tremble. Thornsavan became increasingly nervous when Ware's computer made noises or when Ware typed. Thornsavan asked multiple times whether everything was "checking out" with the computer searches. Although nervousness alone is insufficient to show reasonable suspicion, *id.*, the district court's finding that Thornsavan was nervous throughout the stop and that he became increasingly nervous at times is significant in the totality of circumstances.

[¶ 14] In addition to nervous behavior, Ware observed a "bundle of cash" in the center console with a fifty-dollar bill on top and a twenty-dollar bill on the bottom. Ware's observation provided some evidence that either the vehicle contained drugs or that the money was derived from an illegal activity such as drug trafficking. *See United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 285 (6th Cir. 1992) (stating that "carrying a large sum of cash is strong evidence of some relationship with illegal drugs").

[¶ 15] Unusual or suspicious travel plans may also support reasonable suspicion. *Fields*, 2003 ND 81, ¶ 20, 662 N.W.2d 242. Here, the destination of the trip was Seattle, which Ware testified was a known source location for trafficking marijuana. Further, Thornsavan was driving "straight

through" from Minneapolis to Seattle. Ware stated that while the travel time would have been twenty hours, Thornsavan was only going to be visiting a friend for a few hours in Seattle. This was supported by the lack of visible luggage and the items in the backseat—a backpack, a blanket, and a pillow. The travel distance to spend a relatively short time in Seattle, a source city for drugs, lends some suspicion that illegal activity was afoot. *See United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (finding a twenty-hour trip from Honolulu to Miami to spend forty-eight hours in Miami to be a relevant factor).

[¶ 16] While not exclusive to drug trafficking, the circumstances concerning Thornsavan's vehicle title and the price of his vehicle contributed to reasonable suspicion. First, Ware's initial registration check showed the car was registered to an individual born in 1937, but both Thornsavan and Phommakhy appeared to be in their late 20's or early 30's. Second, Thornsavan provided a photocopied title, as opposed to the original. Third, the title indicated that the car had been purchased only four days prior. Fourth, Thornsavan gave inconsistent statements as to the price of the car (first stating $4,400, then $4,300). Last, Thornsavan's statements as to the price of his car did not match the price on the title, which stated it sold for $2,500. While not immediately suggestive of a particular crime, these events provide some support in favor of reasonable suspicion.

[¶ 17] The district court's other findings supporting reasonable suspicion include: neither Thornsavan nor Phommakhy acknowledged Ware driving alongside; Thornsavan gave inconsistent statements as to the return day; although Thornsavan stated that he and Phommakhy were roommates, the addresses on their licenses did not match; and Thornsavan's break from a single "no" or "oh, no" to a double "no" when asked whether he had any large sums of money in his car. Like a determination of probable cause, reasonable suspicion is determined by the totality of circumstances. The court considers the sum of the circumstances as a "laminated total" and not by separately assessing the individual facts. *State v. Lark*, 2017 ND 251, ¶ 19, 902 N.W.2d 739. Although no one fact before the court may by itself support reasonable suspicion, several taken together can acquire as a whole a significance they lack when taken individually. Most significant here was the long-distance, short-duration trip to a city known as a source for marijuana trafficking while carrying a bundle of cash visible in the center console.

[¶ 18] We conclude there was sufficient competent evidence to support the district court's findings and these findings meet the legal standard for reasonable suspicion.

### IV

[¶ 19] Thornsavan argues that law enforcement violated his Fifth Amendment right against self-incrimination by questioning him without giving him a *Miranda* warning. Thornsavan contends that Ware conducted a custodial interrogation while the two of them were in Ware's squad car.

[¶ 20] A *Miranda* warning needs to be provided only when the suspect is subject to custodial interrogation. *Genre*, 2006 ND 77, ¶ 23; 712 N.W.2d 624. "The test of custody is formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Helmenstein*, 2000 ND 223, ¶ 13, 620 N.W.2d 581 (quotation omitted). This test is objective and "does not depend on the arresting officer's subjective motive or thoughts." *Id.* We thus ask "how a reasonable man in the suspect's position would

have understood his situation." *Id.* at ¶ 14 (quotation omitted). "Whether a suspect is 'in custody' and entitled to a *Miranda* warning is a mixed question of law and fact and, therefore, is fully reviewable on appeal." *Genre,* at ¶ 23. "An individual detained during a routine traffic stop generally is not in custody for the purposes of *Miranda.*" *Id.* at ¶ 24 (quotations omitted). Similarly, "ordering a driver out of the vehicle for officer safety or to issue a citation is reasonable and does not result in a custodial interrogation." *Id.*; *see also State v. Mertz,* 362 N.W.2d 410, 412 (N.D. 1985) (ordering driver into a squad car was reasonable).

[¶ 21] Thornsavan argues that he was in custody when Ware ordered him to step out of his vehicle and sit in his squad car. *Genre,* however, concluded that such action, especially when officer safety is a concern, does not transform a detention into custodial interrogation. *Genre,* 2006 ND 77, ¶ 25, 712 N.W.2d 624. Ware testified that having Thornsavan step out of his vehicle and sit in his squad car was due to: 1) Thornsavan's nervous behavior; 2) the fact that Thornsavan, initially, had his hand down by his lap, which led Ware to believe that Thornsavan could have been concealing something; and 3) officer safety more generally. Under the circumstances, Ware's request was reasonable and did not transform the stop into a custodial interrogation.

[¶ 22] Inside the squad car, Ware asked Thornsavan questions regarding his travel plans, the recent purchase of his car, his relationship with Phommakhy, the contents of his car, and his willingness to consent to a search of his car. These were common sense investigatory questions that Thornsavan should have reasonably expected to answer during his traffic stop. *See Genre,* 2006 ND 77, ¶ 26, 712 N.W.2d 624 (stating that "[d]uring a traffic stop, a

driver should reasonably expect to answer common sense investigatory questions").

[¶ 23] Because a reasonable person in Thornsavan's position would not believe his freedom of movement was restrained to the same degree as a formal arrest, we conclude that Thornsavan was not in custody for the purpose of *Miranda.*

V

[¶ 24] We affirm the district court's forfeiture judgment and its order denying Thornsavan's motion to suppress.

[¶ 25] Jerod E. Tufte

Jon J. Jensen

Lisa Fair McEvers

Gerald W. VandeWalle, C.J.

Crothers, Justice, dissenting.

[¶ 26] I respectfully dissent.

[¶ 27] This is another in a growing line of traffic stops that were prolonged based on claims of officer "training and experience" being argued to justify further detention and investigation. *See, e.g., State v. Walker,* 2015 ND 281, ¶ 10, 871 N.W.2d 451; *State v. Deviley,* 2011 ND 182, ¶ 9, 803 N.W.2d 561; *State v. Asbach,* 2015 ND 280, ¶ 12, 871 N.W.2d 820; *State v. Zacher,* 2015 ND 208, ¶ 2, 868 N.W.2d 847; and *State v. Adan,* 2016 ND 215, ¶¶ 21–23, 886 N.W.2d 841.

[¶ 28] In 2011 Justice Kapsner warned: "[T]he phrase 'officer's training and experience' should not be used to mask what was operating in this case—the officer simply had a strong hunch that these individuals, driving a vehicle with an out-of-state license, were engaged in criminal activity. We have to be mindful not to let 'officer's training and experience' become a substitute for a showing of a true reasonable and articulable sus-

picion that a person is engaged in criminal activity."

*State v. Deviley*, 2011 ND 182, ¶ 27, 803 N.W.2d 561 (Kapsner, J., dissenting).

[¶ 29] In *State v. Adan* I wrote:

"Regarding reasonable articulable suspicion to extend the traffic stop, I agree with the dissent that out of state license plates, a rental car, a GPS device, no visible luggage, an air freshener, one energy drink container and eye drops provide little to no evidence of criminal activity. Kapsner dissent, ¶ 58. Standing alone, grounding suspicion of criminality on possession of these common things simply exposes too many people to prolonged detention to be reasonable under the Fourth Amendment. I also have come to agree with Justice Kapsner's warning in *Deviley* that we must be cautious of reasonable articulable suspicion built on 'officer training and experience.' *Deviley*, 2011 ND 182, ¶ 27, 803 N.W.2d 561 (J. Kapsner, dissenting)."

*State v. Adan*, 2016 ND 215, ¶ 39, 886 N.W.2d 841 (Crothers, J., concurring specially).

[¶ 30] Here, the traffic stop was prolonged based on the officer's hunch that criminal activity was afoot. The State and the officer claimed the officer's "training and experience" permitted him to deduce special meaning from the presence of cash in the center console, a photocopy of the vehicle title and that the driver and passenger had unusual travel plans, appeared nervous, avoided eye contact, stuttered and displayed tremors in their hands. Majority opinion, ¶¶ 3, 13.

[¶ 31] Certainly, these facts have nothing to do with the reason for the stop—overly tinted windows. Nor do I believe these facts are sufficiently tied to interstate drug trafficking so that an officer can rationally link their existence to a "reasonable articulable suspicion" that a crime is occurring or about to be committed. Rather, drivers stopped for a traffic offense normally are nervous. *See State v. Fields*, 2003 ND 81, ¶ 19, 662 N.W.2d 242 (" 'Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.' However, nervousness alone is not enough to establish a reasonable and articulable suspicion because '[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.' ") (citations omitted); *State v. Adan*, 2016 ND 215, ¶ 52, 886 N.W.2d 841 (Kapsner, J., dissenting) ("The officer and the majority rely on 'nervousness' but being nervous is not criminal and unless this Court is going to reverse *Fields*, 2003 ND 81, ¶ 19, 662 N.W.2d 242, it is not sufficient.").

[¶ 32] The temporary registration of a recently purchased automobile is perfectly legal. N.D.C.C. § 39–04–17. While traveling with cash might be novel in this day of credit and debit cards, the existence of a novel fact does not constitute reasonable articulable suspicion justifying being detained for thirty minutes pending arrival of a drug-sniffing dog. Unusual travel plans are the essence of nearly all college students' mostly ill-conceived road trips and mean little or nothing when examining the laminated layers of suspicion. Having only a few personal items in the back seat of a car, with no information about what is in the trunk, also carries little or no legal significance. Here, the officer claims his training and experience permits him to draw conclusions that would evade a layperson, thus permitting him to glue together these facts that otherwise have little to no objective legal significance. *See State v. Deviley*, 2011 ND 182, ¶ 13, 803 N.W.2d 561 (officers may rely on their training and experience to draw inferences

and deductions that may elude a layperson).

[¶ 33] I am not alone expressing concern over the unwise reliance on officer "training and experience." In Massachusetts, the Superior Court wrote:

> "Instead of relying solely on the facts in evidence to justify the stop, the Commonwealth seeks to use the 'training and experience' of the police officers, their conclusions, and their perception of Brockton as a 'source city' for narcotics to reinforce its conclusion that Callahan and McNair possessed drugs. The court finds that this is not sufficient to satisfy the Commonwealth's burden. Certainly, 'a police officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person.' *Commonwealth v. Garcia*, 34 Mass.App.Ct. 645, 650 [614 N.E.2d 1031] (1993). However, in this case the observations were so innocuous as to be insufficient. This case is analogous to *Garcia*. *Id.* In *Garcia*, after making a lawful stop of an automobile, the officer saw an empty transparent glassine baggie in the vehicle. *Id.* at 647 [614 N.E.2d 1031]. Based on his training and experience, he believed the baggie was of a type used for unlawful purposes, namely for drug distribution. *Id.* He then ordered the occupants to exit the vehicle, conducted a pat frisk, and searched the vehicle for drugs, which he found. *Id.* at 647–48 [614 N.E.2d 1031]. One of the passengers admitted the drugs were his. *Id.* at 648 [614 N.E.2d 1031]. The Appeals Court held that the officer lacked probable cause to search the vehicle, because the only factual observation he made prior to the search was of an empty glassine baggie. *Id.* at 650 [614 N.E.2d 1031]. Observation[ ] of such benign objects, capable for lawful as well as unlawful uses, was insufficient to establish probable cause to search the vehicle, even when coupled with the officer's training and experience in narcotics investigations. *Id.* at 651–52 [614 N.E.2d 1031]. Similarly, in this case the observations made by Foley and McDonough were of entirely innocuous activity. Like the benign object observed in *Garcia*, there is nothing inherently suspicious about going to an ATM, driving to Brockton, making telephone calls, and meeting someone on a bicycle. Adding the officers' training and experience can only elevate the level of suspicion into a hunch. A hunch is far too little on which to justify a stop of a motor vehicle. [*Commonwealth v.*] *Phillips*, 413 Mass. [50, 55 (1992)]. The detectives have failed to satisfy the court that their training and experience allowed them to deduce that they had observed a drug transaction in what, to the untrained eye, was entirely innocent activity. *See also Commonwealth v. Alvarado*, 420 Mass. 542, 547, 549, [651 N.E.2d 824] (1995) (viewing an object which may be used for lawful as well as unlawful purposes not sufficient to provide probable cause to arrest individual possessing object; officer's training and experience not sufficient to overcome this deficiency). The Commonwealth has cited no cases to the contrary."

*Commonwealth v. Callahan*, 11 Mass. L.Rptr. 664 (Mass. Super. Ct. Dec. 14, 1999) (emphasis added) (footnotes omitted).

[¶ 34] I also find instructive the thoughtful dissent from Judge Greene of the Kansas Court of Appeals:

> "I respectfully depart the majority to note that this case may be a high watermark in affirming a finding of reasonable suspicion based solely on the hunch of an officer 'with training and experience in enforcing drug crimes' who is

working in 'a high crime area.' I respectfully suggest that, whereas we formerly refused to endorse reasonable suspicion based on a mere hunch, the majority does so in this case because the hunch was that of a 'trained and experienced' officer. In other words, a hunch may not support reasonable suspicion, but the hunch of an officer of undefined but adequate training and experience can indeed support reasonable suspicion. My fear is that the majority moves us ever closer to a purely *subjective* test for reasonable suspicion, abandoning the need to rely on *objective* factors.

. . . .

"Once we endorse a *subjective* standard, based on a rather undefined claim of 'training and experience,' we vest more power in the officer than we do in a magistrate reviewing an affidavit for probable cause. If the officer has sufficient 'training and experience' (whatever that may be), *his* hunch trumps any *objective* factor, and the protection of the Fourth Amendment is eviscerated. Just as the majority has endorsed in this case, where the officer is sufficiently 'trained,' he or she may stop a citizen involved in what appears to be purely innocent conduct so long as *the officer subjectively* believes that a crime has been, is being, or will be committed.

"I concede that the majority's emphasis on the 'training and experience' of the officer is not of its own making; even the Court in *Terry* indicated that reasonable action is to be determined by the 'specific reasonable inferences' the officer is entitled to draw 'in light of his experience.' *Terry [v. Ohio]*, 392 U.S. [1,] 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 [ (1968) ], 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Our Supreme Court has recently emphasized the 'officer's capabilities' in endorsing reasonable suspicion. *See State v. Moore*, 283 Kan. 344,

154 P.3d 1 (2007). Nevertheless, I argue that neither the United States Supreme Court in *Terry* nor our Supreme Court in *Moore* ever intended that the officer's 'training and experience' should *itself* be a factor in the determination, and it certainly should not be the determinative factor in an otherwise close case. In fact, it is clear from the *Terry* Court's analysis that the court is to make its determination of reasonableness based upon what a 'reasonably prudent man would have been warranted in believing' from the specific and articulable facts. *Terry*, 392 U.S. at 28, 88 S.Ct. 1868. And our Supreme Court has oft embraced this standard, stating ' "we judge the officer's conduct in light of common sense and ordinary human experience." ' *Moore*, 283 Kan. at 354, 154 P.3d 1. I contend we should be vigilant in maintaining this *objective* criteria and assure that our deference to an officer's training not eclipse the centrality of an objective standard.

"Let me make clear the slippery slope upon which the majority would launch our reasonable suspicion analyses: so long as the officer effecting the stop is sufficiently trained and experienced, his affirmative statement that he alone perceived that a crime had been, was being, or would be committed is sufficient to support reasonable suspicion for purposes of the Fourth Amendment of the United States Constitution, even if the objective facts would appear to reflect totally innocent conduct to a reasonable prudent person. I truly fear that this development will serve to license unbridled deprivation of the comprehensive right of personal liberty intended to be protected by the Fourth Amendment."

*State v. Cook*, 38 Kan.App.2d 20, 161 P.3d 779, 783–86 (2007) (Greene, J., dissenting).

[¶ 35] I join Judge Greene's concerns that the wholesale use of unspecified "training and experience" permits the creation of a connection between otherwise innocuous events and reasonable articulable suspicion when that suspicion is based solely on an officer's subjective opinions. This is not the objective standard for determining reasonable articulable suspicion that has been used for decades. This is not the level of proof courts should use to permit the warrantless seizures and detention of persons and property because officers *think* criminal activity is afoot. This is not the protection of personal liberty for which the Fourth Amendment was designed.

[¶ 36] I would reverse the district court's order denying the motion to suppress and the judgment granting forfeiture of the assets. Having concluded the search and seizure was unlawful, reaching the other issues would be unnecessary.

[¶ 37] Daniel J. Crothers