No. 93,386

STATE OF KANSAS, *Appellee,* v. GEORGE MOORE, *Appellant.*
(154 P.3d 1)

346

Opinion filed March 16, 2007.

*Randall L. Hodgkinson,* of Kansas Appellate Defender Office, argued the cause and *Nathan B. Webb,* of the same office, and *Brian W. Woolley,* legal intern, were with him on the brief for appellant.

*Tony Cruz,* assistant county attorney, and *Phill Kline,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: The district court denied George Moore's motion to suppress and convicted him of possession of marijuana with the intent to deliver and of failure to affix drug tax stamps. The Court of Appeals affirmed in *State v. Moore,* 34 Kan. App. 2d 795, 124 P.3d 1054 (2005). We granted Moore's petition for review under K.S.A. 20-3018(b).

The sole issue on appeal is whether the motion to suppress should have been granted. We affirm.

## FACTS

On October 16, 2002, Kansas Highway Patrol Lieutenant Richard Jimerson and Junction City Police Officer James Oehm were parked in the median of I-70 west of Junction City. Around 3:35 p.m., Jimerson observed a vehicle heading eastbound following a red car closely. Both of the vehicles were in the right-hand lane. According to Jimerson, the vehicle he observed was "only about a car length and a half behind this red car." He pulled out to pursue, timing the distance between the two vehicles at .72 seconds. Jimerson then executed a traffic stop.

After the vehicle pulled over, Jimerson approached the driver from the passenger side in order to avoid traffic. He informed the driver, later identified as George Moore, that he had stopped the vehicle because it was following the other car too closely. According to Jimerson, Moore acknowledged that he was following too closely and apologized. However, Moore denied this.

Jimerson asked Moore for his driver's license and registration, which he produced. The vehicle was registered to James Ward. During the exchange, Jimerson noted that Moore appeared highly nervous. His hands were shaking, and he was breathing deeply; he appeared more nervous than the regular nervousness Jimerson has observed of drivers during the thousands of traffic stops he had made in his 15-year career. Jimerson also smelled a "slight odor" of fabric softener, which he knew from his experience with the highway patrol was often used to conceal the odor of drugs.

During the stop, Officer Oehm arrived as back-up. Jimerson ran Moore's license through dispatch, which initially reported the license suspended. Jimerson then asked Oehm to inform Moore of the suspension. When Oehm did so, Moore reacted with confusion and surprise. When questioned about his travel plans, Moore stated that he was returning from Las Vegas to his home in Maryland and a friend had loaned him the car. Moore further stated that he had gone to Las Vegas for an army airborne reunion.

Dispatch later informed Jimerson that Moore's license was not suspended. He informed Moore of the error and issued a warning for following too closely. When Jimerson returned Moore's license and registration, he informed Moore that was "all [he] had for him." Jimerson observed that Moore remained nervous to the same degree as before.

According to Jimerson, Moore placed his hand on the gearshift as if he was going to drive away. Moore, however, claimed that he did not attempt to leave because Jimerson was leaning against the frame of the passenger window. Before Jimerson moved from the side of the vehicle, he asked Moore if he could ask him some more questions. Moore agreed, and Jimerson asked whether Moore possessed contraband, such as weapons or drugs. Moore denied possessing contraband.

Jimerson claimed that when he requested permission to search the car, Moore replied that he could look wherever he wanted. Moore, however, testified that Jimerson only asked about the army duffel bag in the backseat, which Moore said contained laundry. Moore offered to show Jimerson the contents of the bag but claimed that any consent was limited to the bag. Instead of then

searching the bag, Jimerson asked Moore to open the trunk; Moore complied.

After searching the trunk, Jimerson looked underneath the car. He entered the car and searched the duffel bag, finding no fabric softener sheets inside, but noticing that the fabric softener smell was much stronger in the backseat area. He then searched both the passenger and driver sides of the interior. He testified that from his experience, the quarter panel is a common drug concealment area in this type of car. The quarter panel apparently contained an ashtray area.

The record is unclear whether Jimerson removed the ashtray in the quarter panel or whether it had been removed prior to his entry into the car. He does not remember, and there is no testimony indicating that he removed it. Nevertheless, when he looked in the ashtray cavity area, he noticed a nonfactory hinge on the door quarter panel. He also saw a felt covering; it too was nonfactory. Jimerson concluded he was confronted with a nonfactory panel. He then pulled molding from around the door edge and the plastic panel from the door, revealing a vacuum sealed package wrapped in fabric softener sheets. Inside of the package, Jimerson saw green vegetation that he believed was marijuana.

Upon Jimerson's discovery, he instructed Oehn to arrest Moore, who was subsequently charged with possession of marijuana with intent to deliver, in violation of K.S.A. 65-4163(a)(3), and the failure to affix a drug stamp, in violation of K.S.A. 79-5204(a) and K.S.A. 79-5208. A later search revealed a total of 55 pounds of marijuana hidden in the vehicle.

Moore filed a motion to suppress the seized items. After hearing testimony and watching a videotape of the stop, the district court concluded that the search and seizure did not violate Moore's Fourth Amendment rights. The court convicted Moore of both charges and sentenced him to 18 months' probation with concurrent underlying prison sentences of 15 months for possession of marijuana with the intent to deliver and 6 months for failure to affix a tax stamp.

Moore appealed, and a majority panel of our Court of Appeals affirmed, with Judge Greene dissenting.

Other facts will be supplied as are necessary to the legal analysis.

## ANALYSIS

Issue: *The evidence was not seized in violation of Moore's Fourth Amendment rights.*

Moore argues that the district court erred in failing to suppress for a number of reasons: he contends that the traffic stop was illegal; that even if the stop was legal, it was not lawfully extended because it did not become consensual nor was reasonable suspicion present; that even if the stop was legally extended, he did not give voluntary consent to the search; that even if he did give consent to the search, Jimerson exceeded the limited scope of the consent; and that even if he gave consent to search the entire car, Jimerson exceeded even that scope by impairing the structural integrity of the car in his door search.

Each reason will be addressed in turn.

### Overall standard of review

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides identical protection to the Fourth Amendment. *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006).

When reviewing a motion to suppress evidence, this court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. *State v. Horn*, 278 Kan. 24, 30, 91 P.3d 517 (2004). The State bears the burden to demonstrate that a challenged search or seizure was lawful. *Anderson*, 281 Kan. at 901.

### Legality of the traffic stop

Moore first argues that the traffic stop was illegal. A traffic stop is a seizure under the purview of the Fourth Amendment. Thus, in order to stop a vehicle, "an officer must have articulable facts

sufficient to constitute reasonable suspicion under K.S.A. 22-2402(1) and *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). [Citation omitted.] A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual. [Citations omitted.]" *Anderson,* 281 Kan. at 901.

Whether reasonable suspicion exists is a question of law. We use a mixed question standard of review: whether substantial competent evidence supports the district court findings, while the legal conclusion is reviewed de novo. See *Ornelas v. United States,* 517 U.S. 690, 699, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996); *United States v. Dodson,* 109 F.3d 486, 488 (8th Cir. 1997).

The district court analyzed the stop as follows:

"The flow of traffic was about 68 miles per hour, at milepost 293, where the car was stopped. And Mr. Moore's car was .72 seconds behind the car in front of him, which is less, of course, than 1 second, and, at that speed constituted in the opinion of the officer, a violation of the statute, for following too closely. So, therefore, the Court finds that the stop here was legal."

The stop was initiated based upon Jimerson's observation that Moore's car was following another vehicle too closely on the highway in violation of K.S.A. 8-1523(a). It states: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Jimerson concluded that Moore was following too closely by (1) calculating that Moore was traveling less than 1 second behind the other car, and (2) estimating the number of car lengths between the vehicles in relation to their speed of travel. Moore argues, however, that because the statute does not explicitly provide for "car length" or "2-second rule" tests, the tests are not appropriate indicators of a violation of the statute.

As the Court of Appeals majority acknowledged, no Kansas appellate cases have construed the statute. However, the Tenth Circuit has stated that the statute takes into consideration four variables: speed, following distance, road conditions, and traffic conditions. *United States v. Vercher,* 358 F.3d 1257, 1262 (10th Cir. 2004). In light of these conditions, the *Vercher* court upheld an officer's determination that the defendant was following too

closely based on the car length test. 358 F.3d at 1261-62. Additionally, the Tenth Circuit has also concluded that an officer's use of the 2-second rule provided a " 'minimum level of objective justification' required for reasonable suspicion justifying a traffic stop." *United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004), *vacated and remanded on other grounds* 543 U.S. 1113 (2005), *conviction reinstated* 410 F.3d 1186 (2005).

The Court of Appeals majority acknowledged that Moore disputed Jimerson's version of the events. Moore testified that he was never closer than 100 feet behind the car in front of him, and that the red car was not directly in front of him, but was rather in the passing lane. An appellate court, however, does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2004). The district court's findings, based upon Jimerson's testimony, are supported by substantial competent evidence.

Under the rationale of both *Vercher* and *Nichols*, we independently conclude that Jimerson's use of two different tests provided an objective justification required for reasonable suspicion justifying the stop of Moore's vehicle.

*Extension of the traffic stop*

Moore next argues that even if the traffic stop was legal, it was not lawfully extended because it did not become consensual nor was reasonable suspicion developed during the stop.

In *Anderson*, this court discussed what an officer may do during a routine traffic stop:

"A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he or she is entitled to operate the car, the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer for additional questioning." 281 Kan. at 902.

A driver may be detained after a routine traffic stop, however, if the encounter becomes consensual. *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998). As the Court of Appeals majority stated, an encounter is not consensual where a reasonable person

would not feel free to leave. 34 Kan. App. 2d at 801 (citing *State v. Reason*, 263 Kan. 405, 410, 951 P.2d 538 [1997]). The *Reason* court also held that the reasonable person test is determined by looking at the totality of the circumstances. 263 Kan. at 411. This analysis therefore bears considerable similarity to the one for determining "custody" during a police interrogation. See *State v. James*, 276 Kan. 737, 749, 79 P.3d 169 (2003) (An objective standard is utilized to judge whether an interrogation is custodial. The proper analysis examines how a reasonable person in the suspect's position would have understood the situation. The determination is made based upon a totality of the circumstances applying the objective standard of a reasonable person.).

Accordingly, like the analysis for custody, we conclude the appellate analysis for whether a reasonable person would feel free to leave after a traffic stop should consist of two parts: first, the factual underpinnings of a district court's decision are reviewed under a substantial competent evidence standard; second, the ultimate legal conclusion drawn from those facts, *i.e.*, whether a reasonable person would feel free to leave, is reviewed under a de novo standard. See *James*, 276 Kan. 750-53; see also *Harris v. Commonwealth*, 266 Va. 28, 32, 581 S.E.2d 206 (2003) (whether extension of a lawful detention for a traffic infraction is consensual, *i.e.*, whether a reasonable person would feel free to leave, is a mixed question of fact and law [citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996)]); *United States v. Smith*, 423 F.3d 25, 31 (1st Cir. 2005) (mixed question of fact and law, citing *Ornelas*); and *State v. Story*, 53 Conn. App. 733, 739, 732 A.2d 785 (1999).

Here, the district court determined that the encounter became consensual:

"Officer Oehm arrived shortly after— within, it seemed to the Court, virtually minutes of the stop by Lieutenant Jimerson. The papers, driver's license, etc., were returned to the defendant. Officer—Lieutenant Jimerson testified the defendant was extremely nervous, which flies in the face of testimony that of Officer Oehm, who said the defendant was a little bit nervous, of course, I believe that's probably a subjective thing by each one of those officers. In any event, he did show some nervousness.

. . . .

"According to Lieutenant Jimerson, and his testimony was clear on this, and the Court wrote it down, put a check mark by it, the question was asked, Can I search your car? And the answer, according to Lieutenant Jimerson—I know that this is all disputed by the defendant—but the answer by the defendant was, you can look wherever you want. Period. Now, that's the testimony I wrote down, specifically by Lieutenant Jimerson.

"Now, this—I understand that the defendant had his hand on the gear shift and was ready to put the car in gear to leave around the same time that—that that happened. The defendant never put the car, obviously, in drive and did not drive away. And so I suppose there's a question about whether or not he felt he was free to go.

"Court finds that—under all of the circumstances existing in this case, that the defendant—is reasonable for the Court to believe the defendant believed he was free to go.

. . . .

"[T]he Court believes that . . . the defendant knew he was free to leave."

On the other hand, the Court of Appeals majority disagreed that the Jimerson-Moore encounter became consensual:

"The district court relied on evidence the defendant placed his hand on the gearshift level in determining the defendant felt free to go. This evidence, apparently, is the only evidence upon which the court based its decision the defendant felt unrestrained by the officer. We further note that, according to Trooper Jimerson, the defendant was told the officer was finished with him at the time the license and registration were returned.

"In contrast, the record undisputably demonstrates that Trooper Jimerson activated his emergency lights to stop the defendant's vehicle. After returning the defendant's license and registration, the trooper did not move away from the car but immediately asked if the defendant would answer some questions. During this time, Officer Oehm was standing near the defendant's vehicle. When two officers are standing next to a stopped vehicle, presumably with the emergency lights still activated, no reasonable person would feel free to drive away. See *State v. Morris*, 276 Kan. 11, 22-23, 72 P.3d 570 (2003) (discussing a string of cases dealing with the use of emergency lights as a show of authority). Under the circumstances presented in this record, the further detention of the defendant cannot be deemed consensual." 34 Kan. App. 2d at 802.

The majority assumes that Jimerson's lights were activated throughout much of the stop. The videotape does not support this assumption. The tape does disclose, however, that Jimerson is a large, physically imposing individual. It also discloses that for some time after returning the license and registration and after telling Moore that is "all I have for you," he remained with his face at the

passenger-side window, apparently alternating between leaning on and nearly touching the frame. The videotape, and Jimerson's testimony, establish that Oehm, also armed, was close behind him. See *Anderson*, 114 F.3d 1064 (presence of more than one officer may indicate coercive authority). It was during this time that Jimerson asked Moore if he would answer some questions. Based upon these facts, we independently conclude that a reasonable person would not feel free to leave. We agree with the majority that the district court erred in holding the detention was consensual.

Absent a consensual extension of the stop, further questioning is permissible only if during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity. See *DeMarco*, 263 Kan. at 734. As mentioned, our review of reasonable suspicion is a mixed question of fact and law.

In *DeMarco*, this court discussed additional considerations for how "reasonable suspicion" is evaluated:

" 'What is reasonable is based on the totality of the circumstances and is viewed in terms as understood by those versed in the field of law enforcement. [Quoting *State v. Toney*, 253 Kan. 651, 656 (1993)]. . . .
'[W]e judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] "Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." ' " 263 Kan. at 734-35 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 [10th Cir. 1997]; citing *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 [1989]).

Similarly, the United States Supreme Court has stated:

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification . . . . [Citation omitted.] The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity. [Citation omitted.]" *Illinois v. Wardlow*, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000).

Here, Jimerson testified that he was suspicious of illegal activity based upon: (1) Moore's severe nervousness; (2) the odor of dryer sheets/fabric softener in the car; (3) Moore's travel route from Las Vegas to Maryland (4) with little clothing; and (5) the fact the car was not registered to Moore. His testimony constitutes substantial competent evidence to support the findings made by the district court, as supplemented by the majority from the record on appeal.

Because the district court found Moore consented to extend the stop, it really did not address the alternative basis of reasonable suspicion. It did, however, acknowledge the presence of Moore's nervousness and Jimerson's smell of fabric softener:

"Lieutenant Jimerson testified the defendant was extremely nervous, which flies in the face of testimony that Officer Oehm, who said the defendant was a little bit nervous—of course, I believe that's probably a subjective thing by each one of those officers. In any event, he did show some nervousness.

"Lieutenant Jimerson smelled an odor of fabric softener coming from within the vehicle driven by the defendant, and believed because of the indicators and his experience in these matters that the defendant may have had illegal narcotics in the car."

In concluding Jimerson possessed a reasonable suspicion to extend the stop, the majority examined *DeMarco*, 263 Kan. 727. There, eight factors contributed to an officer's suspicion that defendants were transporting drugs: (1) nervousness; (2) cross-country travel from a city known as a source for drugs; (3) an indirect route of travel; (4) a rental car; (5) a short return time of 3 days for the rental car; (6) travel on I-70, a known drug trafficking route; (7) inconsistent stories about how the men reached California; and (8) criminal history. 263 Kan. at 735-41.

The *DeMarco* court discussed the role "nervousness" plays in the reasonable suspicion inquiry: " 'It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer. [Citations omitted.]' " 263 Kan. at 736 (quoting *United States v. Wood*, 106 F.3d 942, 948 [10th Cir. 1997]). The court noted that while nervousness alone is not enough to form reasonable suspicion, when coupled with other factors, reasonable suspicion may arise. 263 Kan. at 739-41.

The Court of Appeals majority asserted that the factors discussed in *DeMarco* are similar to the factors cited by Jimerson:

"The defendant [Moore] appeared more nervous than typical drivers during a routine traffic stop. However, as indicated in *DeMarco*, Trooper Jimerson had no prior interactions with this particular defendant to base his opinion that the defendant's symptoms of nervousness were indicative of criminal activity. As a result, while this factor can be considered, it is not alone indicative of criminal activity.

"Here, prior to the termination of the traffic stop, the investigating officers learned that the defendant was traveling across the country from Las Vegas to Baltimore. Unlike in *DeMarco*, the route used was a reasonably direct route between those destinations. However, the vehicle driven by the defendant was not registered to him. These are factors a court may consider in determining whether an officer possessed reasonable suspicion to justify a longer detention than required to effect the traffic stop, albeit very weak factors. [Citation omitted.]" 34 Kan. App. 2d at 804.

After acknowledging similarity to the present case, the majority noted that *DeMarco* did not involve the odor of fabric softener dryer sheets. The majority concluded that the odor of dryer sheets "represents a *significant departure* from the facts of *DeMarco*, as this factor relates specifically to a known technique related to drug trafficking." (Emphasis added.) 33 Kan. App. 2d at 804.

As discussed by the majority, other jurisdictions have concluded that the odor of dryer sheets, even when combined with nervousness, does not give rise to reasonable suspicion. See *State v. Thompson*, 256 Ga. App. 188, 190, 569 S.E.2d 254 (2002) ("Although laundry detergent and dryer sheets can be used to mask the odor of an illegal substance, they are themselves legal substances that can be used for a legal purpose and thus do not justify the officer's further detention . . . ."); *Rios v. State*, 762 N.E.2d 153, 157 (Ind. App. 2002) (seizure and search of package was not justified by reasonable suspicion where the sender's mailing address was California, and the package, which bore an odor of dryer sheets, was sent next-day air; nevertheless, smell testing by a trained dog was itself sufficient to support probable cause); and *Com. v. Phinn*, 761 A.2d 176, 186 (Pa. Super. 2000) (driver's strange behavior and the odor of dryer sheets did not support reasonable suspicion); see also *Charity v. State*, 132 Md. App. 598, 630-31, 753 A.2d 556 (2000) (odor of a large quantity of air fresh-

eners contributed to officer's "strong hunch" of drug related activity, but did not raise an articulable suspicion, even when combined with other factors).

Despite acknowledging the contrary authority, the majority found persuasive reasoning from the Eighth Circuit, which concluded that an odor of a known masking agent may be indicative of illegal drug activity. See *United States v. Pollington*, 98 F.3d 341, 343 (8th Cir. 1996) (driver's nervousness, the odor of laundry detergent known to be commonly used by drug traffickers to mask smell of narcotics, and the use of a gas-guzzling motor home to drive from Michigan to Las Vegas for a brief trip justified detention after traffic stop); and *United States v. Bloomfield*, 40 F.3d 910, 918-19 (8th Cir. 1994), *cert. denied* 514 U.S. 1113 (1995) (driver's nervousness, possession of a pager, and the strong odor of a masking agent justified detention). The majority concluded that *Pollington* and *Bloomfield* stand for the proposition that a strong odor of a masking agent is "highly probative of illegal drug activity." 33 Kan. App. 2d at 805.

The majority also examined another Eighth Circuit case, *United States v. Carrate*, 122 F.3d 666 (8th Cir. 1997). There, the court discussed several factors that justified further detention following a valid traffic stop:

"The troopers testified that the following factors raised their suspicion that Tinoco [Carrate] may have been transporting drugs: (1) Tinoco was not the owner of the vehicle, (2) Tinoco was in route from California to Illinois, (3) California is a point of origin for illegal drugs, (4) Chicago is a common destination for the shipment of illegal drugs, (5) Tinoco had very little clothing in the car to suggest a legitimate trip, (6) the six year-old car had high mileage, and (7) Tinoco had a prior criminal history in California. The experience and training of the troopers had informed them that the listed factors were consistent with and indicative of drug courier characteristics." 122 F.3d at 669.

Apparently relying on the reasoning of *Carrate*, the majority upheld Moore's detention: "While it may be a close case, we believe that under these circumstances a reasonably prudent law enforcement officer would have possessed a suspicion the vehicle was being used for drug trafficking." 34 Kan. App. 2d at 806. Therefore, it concluded that Jimerson was justified in asking some further

questions to investigate his suspicion, and that later Moore's consent justified the continued detention and search.

Judge Greene dissented from his two colleagues:

"Moore had reasonable and plausible explanations for both his possession of the vehicle and his route. Nervousness must be discounted, as recognized by the majority. Accordingly, this case turns on the impact of the perception by the officer of the odor of fabric softener dryer sheets.

"I respectfully suggest that the Eighth Circuit Court of Appeals' cases relied upon by the majority do not reflect the better approach to this problem, nor can they be squared with controlling authority from our own Kansas Supreme Court [*DeMarco*]. As noted by the majority, most jurisdictions have concluded that the mere odor of dryer sheets, even when coupled with one or more mildly suspicious factors, does not support a finding of reasonable suspicion of criminal activity. . . . [It] is clear that the Eighth Circuit has a far more generous view of such factors than does our Kansas Supreme Court. Arguably, the factors deemed adequate in *Carrate* are considerably less weighty than those deemed insufficient in *DeMarco*. Accordingly, the majority's reliance on the Eighth Circuit authorities seems misplaced." 34 Kan. App. 2d at 811-12.

As we begin our analysis, we first note that *DeMarco*, which did not contain any fabric softener sheets or any odor possibly indicative of drugs, was a "close" case, and whether the evidence should have been suppressed, *e.g.*, because no reasonable suspicion existed, was not an "easy" question. 263 Kan. at 741.

Second, we observe that a "masking agent," despite having legitimate retail purposes, may also be used to conceal drugs and certainly may be considered in the reasonable suspicion calculus. *United States v. West*, 219 F.3d 1171, 1178-79 (10th Cir. 2000). The weight assigned to the odor, however, varies with the circumstances. *State v. Malone*, 274 Wis. 2d 540, 683 N.W.2d 1 (2004) ("The presence of *seven or eight* air fresheners in a vehicle occupied by three young men with an average age of 21 does not provide probable cause for the search of a vehicle, but it certainly raises suspicion and justifies reasonable inquiry.").

Third, we also note that the Eighth Circuit's *Carrate* opinion listed, as a factor supporting the court's decision, the small amount of clothes carried by the driver for a trip of such duration. Similarly, Jimerson testified that was a factor justifying Moore's detention. Like the majority, we acknowledge that Moore's extreme nervous-

ness and his driving a car not registered to him cross-country and back are factors, although not necessarily strong ones. However, a car containing little clothing during a trip across the country, coupled with the odor of dryer sheets in the car, increases the possibility of reasonable suspicion. A law enforcement officer could legitimately question whether a man on a trip from Las Vegas to Maryland would stop along the way to do laundry with fabric softener sheets, or use the fabric softener sheets in Las Vegas while attending an army airborne reunion.

Next, we acknowledge the district court's repeated references to Jimerson's capabilities. The court took judicial notice that Jimerson instructs other law enforcement personnel on drug interdiction methods. It acknowledged that Jimerson has an "extreme amount of experience in interdiction of drug offenses" on highways in the State. The court stated that "[t]he court is aware . . . he knows, or has reason to know, when a person may be involved in drug trafficking or delivery." It also took notice that Jimerson has been involved as an officer in other appellate court cases involving vehicle stops and searches.

Jimerson's testimony, coupled with his capabilities, supply a basis for us to conclude that reasonable suspicion exists to extend the traffic stop. See *DeMarco,* 263 Kan. at 735 (" '[W]e judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] . . . . We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification." ' ").

We emphasize that because whether reasonable suspicion exists depends upon the totality of the circumstances, a case-by-case evaluation is required. See *DeMarco,* 263 Kan. at 735. Accordingly, a broad reading of our opinion today is expressly discouraged. We do not advocate a total, or substantial, deference to law enforcement's opinion concerning the presence of reasonable suspicion. The officers may possess nothing more than an "inchoate and unparticularized suspicion" or "hunch" of criminal activity. See *Illinois v. Wardlow,* 528 U.S. 119, 123, 145 L. Ed. 2d 570, 120 S. Ct.

673 (2000). Such a level of deference would be an abdication of our role to make a de novo determination of reasonable suspicion. But, in this close case, we give appropriate deference to the opinions of a particular law enforcement officer on the scene who, with thousands of traffic stops, is highly experienced in roadside searches and seizures and determinations of reasonable suspicion.

*Consent to search*

Moore next argues that even if reasonable suspicion justified a further detention for questioning, his consent to search during the extended stop was not voluntary. The district court disagreed, simply finding that consent was properly given and "was knowing, voluntary, and unequivocal."

The State bears the burden of showing that the defendant's consent to search was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973). Unlike our legal conclusions on whether a reasonable person would feel free to leave after return of Moore's license and registration, voluntariness of a consent to search is a question of fact to be determined from all the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996) (citing *Schneckloth*, 412 U.S. at 248-49). As stated by the majority, some evidence demonstrated that Jimerson requested Moore's consent to search while by the passenger-side window. Neither Jimerson nor Officer Oehm drew their weapons. Moreover, Moore did not testify that he was threatened by the officers nor was his mental capacity challenged. Based on these facts, the majority reasoned that Moore's consent was a product of his free will.

An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2004). Given our limited standard of review on this issue, we determine that substantial competent evidence—as stated by the majority—supports the district court's factual finding that Moore's consent to search was voluntary.

*The scope of the consent to search*

Moore next argues that even if his consent was voluntarily given, Jimerson's search exceeded the scope and duration of his consent. He asserts that he only gave Jimerson permission to search the duffel bag. Nevertheless, he concedes that the scope of his consent was contested, and that resolution depends "on whom is believed," *i.e.*, a question of fact. We review findings of fact for substantial competent evidence supporting them.

The district court found that according to Jimerson,

"the question was asked, 'Can I search your car?' And the answer, according to Lieutenant Jimerson—and I know that this is all disputed by the defendant, but the answer by the defendant was, 'you can look wherever you want.' Period. Now, that's the testimony I wrote down, specifically, by Lieutenant Jimerson."

It ultimately denied Moore's claim that the search violated the Fourth Amendment, impliedly holding that consent had been given to search the entire car.

The district court apparently believed Jimerson's testimony over Moore's. The majority of the Court of Appeals observed that an appellate court does not weigh the evidence or judge the credibility of witnesses. See *Swanigan*, 279 Kan. at 23. Accordingly, it "must adopt the district court's finding that the scope of the search was not limited by the defendant's consent." 34 Kan. App. 2d at 806-07.

We agree with the majority. Given our limited standard of review, we determine that substantial competent evidence—Jimerson's testimony—supports the district court's finding of an unlimited scope of Moore's consent.

*Scope of consent and purported structural impairment of Moore's car*

Finally, Moore argues that even if he had given consent to search the entire car, such consent did not extend to Jimerson's disassembling the car to look for contraband. In support, Moore cites *People v. Gomez*, 5 N.Y.3d 416, 805 N.Y.S.2d 24, 838 N.E.2d 1271 (2005). There, the police observed fresh undercoating around the gas tank and received the driver's consent to search his car. One officer went to the rear seat, unlocked it, and pulled it back. He observed gray

"nonfactory" carpet in the location above the area where he earlier had spotted fresh undercoating. He then pulled up the glued carpeting and found a floorboard cut. He used his pocketknife to twist open the sheet metal floorboard. When he failed to reach what he believed to be a plastic bag, he retrieved a crowbar and pried open part of the gas tank. Seven bags of cocaine were retrieved from the compartment in the gas tank.

The *Gomez* court concluded that the search exceeded the scope of the defendant's consent:

"In the absence of other circumstances indicating that defendant authorized the actions taken by police, a general consent to search alone cannot justify a search that impairs the structural integrity of a vehicle or that results in the vehicle being returned in a materially different manner than it was found. . . . Here, the officer clearly crossed the line when he took this action without first obtaining defendant's specific consent." 5 N.Y.3d at 420.

However, the *Gomez* court specifically expressed "no opinion as to whether the search was otherwise supported by probable cause" because that issue had not been reviewed below. 5 N.Y.3d at 421.

Our Court of Appeals majority determined that Jimerson exceeded the scope of Moore's consent to search the entire car when he impaired the car's integrity by removing the molding:

"[T]he reasoning of the New York Court of Appeals is persuasive, especially in light of the dicta [discussed by the *Gomez* court] from *Jimeno*, 500 U.S. 251-52. The defendant's consent did not extend to pulling plastic molding away from the quarter panel of the interior of the defendant's vehicle, even if the molding was hinged to form a compartment." 34 Kan. App. 2d at 807-08.

It then proceeded to hold that despite Jimerson exceeding the scope of Moore's consent by pulling the molding loose, the resultant search was justified because of probable cause developed during the part of the search to which Moore had consented.

In our view, a *Gomez*-based analysis is unnecessary under our facts because Jimerson's removal of the molding occurred only after probable cause had developed, entitling him to expand his search. See *United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir. 1997) (citing *Florida v. Meyers*, 466 U.S. 380, 381, 80 L. Ed. 2d 381, 104 S. Ct. 1852 [1984]) ("The Supreme Court has held that 'police officers who have probable cause to believe there is

contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.' ").

Pursuant to Moore's consent, Jimerson had general authority to search Moore's car; while within that scope he saw the ashtray. The majority correctly stated that Moore's general consent to search enabled Jimerson to search all readily opened containers and compartments within the vehicle, including the ashtray. 34 Kan. App. 2d at 808 (citing *Florida v. Jimeno*, 500 U.S. 248, 251, 114 L. Ed. 2d 297, 111 S. Ct. 1801 [1991]). It is unknown whether the ashtray had been removed prior to Jimerson's search, or whether he did it.

When Jimerson looked in the ashtray cavity area, he noticed a nonfactory hinge on the door quarter panel. He also found a felt covering, which also was nonfactory. He concluded he was facing a nonfactory panel, which could lead to a hidden compartment. This additional information contributed to potential probable cause to continue a search. See *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) ("It is well established that evidence of a hidden compartment can contribute to probable cause to search."); see also *United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006) ("Because the evidence was highly probative of the existence of a secret compartment, and because it is difficult to imagine a licit purpose for a large hidden compartment in a vehicle the size of a Chevy van, these signs of a hidden compartment strongly suggest—and perhaps even singlehandedly establish—probable cause to search behind the side panels in the rear of the van.").

The majority also correctly concluded that the evidence of a hidden compartment, coupled with the smell of fabric softener sheets (a smell now stronger in the backseat according to Jimerson's testimony) often associated with masking the odor of drugs, constituted probable cause. 34 Kan. App. 2d at 808; see also *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990) (evidence of hidden compartment, along with inadequate amount of luggage for claimed duration of trip, furnished probable cause). Probable cause allowed Jimerson to extend his warrantless search. See *Anderson*, 114 F.3d 1059. Accordingly, probable cause allowed Jimerson to

pull the molding from around the edge of the door where he observed the fabric softener-wrapped package of marijuana.

Before this court, Moore now suggests that Jimerson exceeded the scope of Moore's search consent because, similar to *Gomez*, Jimerson impaired the car's structural integrity by using a knife to pry out the ashtray. He further reasons that because Jimerson would be unable to see what lay beyond the ashtray while it was in place, Jimerson possessed no additional information, *e.g.*, the compartment, which could add to his known information—including the fabric softener smell—to produce probable cause.

As mentioned, the record on appeal is unclear about how the ashtray came to be removed and, if by Jimerson, whether he used a knife. Office Oehm testified that he thought "there was [an ashtray] removed." Jimerson testified that he had a knife in his hand at one point but did not "remember . . . if I pulled out the ashtray" and "I don't remember if it was already out or if I took it out." The videotape appears to show an object in his hand, but the camera angle does not show any use of the object, particularly any prying. Nevertheless, Moore asks us to infer that Jimerson used his knife to take out the ashtray. If we are unwilling to draw such an inference, in the alternative he argues that the burden of proof is on the State to prove a legal search. According to Moore, we therefore should hold that the State did not meet its burden to show Jimerson did *not* use his knife to remove the ashtray and did not impair the car's structural integrity. We reject Moore's position.

The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed.

ALLEGRUCCI, J., not participating.

LOCKETT, J., Retired, assigned.