(161 P.3d 779)
No. 93,825

STATE OF KANSAS, *Appellee*, v. HOWARD COOK, *Appellant*.

Opinion filed June 29, 2007.

*Janine Cox*, of Capital Appellate Defender Office, for appellant.

*Amanda Voth*, legal intern, *Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before GREENE, P.J., MCANANY and BUSER, JJ.

MCANANY, J.: Sergeant Thomas Hongslo was patrolling in the area of I-35 and 95th Street in Johnson County at 11:45 p.m. He was a 14-year veteran of the police force with experience and training in drug intervention, including training at the Operation Pipeline School conducted by the Drug Enforcement Administration,

as well as two street narcotics schools. He and other officers patrolled the area because of its high incidence of drug activity and their success in making arrests and recovering narcotics. He had found the area to be particularly suited for narcotics activity because of its convenient location and access to pay phones at two gas stations there. In fact, since 1995 there had been 8 drug arrests at the nearby Phillips 66 station and 13 at the nearby Texaco station. In the 16-block area there had been 668 drug arrests since 1995. Records from the Lenexa Police Department disclose that 32% of all drug arrests in that city occurred within a half square-mile area that included these two gas stations.

Hongslo was in uniform that night but was driving an unmarked car. He observed a gold Dodge pickup truck with tinted windows parked at the Phillips 66 gas station out of the line of sight of the clerk inside the station. When Hongslo drove past the gold truck he made eye contact with the driver, who saw that Hongslo was wearing a police uniform. Hongslo then drove to the parking lot of an adjoining business and continued to observe the gold truck.

After a few minutes, a blue Ford Ranger pickup truck pulled into the gas station and parked directly behind the gold pickup. Howard Cook got out of the passenger's side of the blue truck and walked towards the gold truck. The gold truck started driving away, and Cook slowly jogged toward it and whistled. The gold truck did not stop. Cook returned to the blue truck and the two trucks drove across the bridge spanning I-35 to another nearby gas station, JB's One Stop, located at 95th Street and Noland Road. The gold truck backed into a parking space. The blue truck parked 50 feet away. At that point, Cook got out of the blue truck, ran to the gold truck, and got in on the passenger's side. After less than a minute, Cook returned to the blue truck. The blue truck then drove to the front of the gas station, and Cook got out and went inside the gas station. The gold truck drove away.

Based on his training and experience, the behavior of the two individuals, the time of night, the short time Cook spent in the gold truck, and the location where the vehicles were parked, Hongslo believed a drug transaction had taken place. He radioed for Officer Shannon Trevino to stop the gold truck. Hongslo then observed

Cook exit the gas station carrying a red soda can. Cook got into the blue truck which left the scene and drove south on I-35.

Hongslo stopped the blue truck. Its driver, Terrance Brown, told Hongslo that he had driven Cook to the gas station to meet someone to get some clothes. Brown denied knowing anything about a drug transaction and consented to a search of the truck.

Hongslo then asked Cook why he had made contact with the person in the gold truck. Cook responded that he was meeting the person about a job. In the course of searching the truck Hongslo saw a red Coke can on the dashboard in front of the passenger's seat. Inside the soda can, Hongslo saw a plastic bag with a white powdery substance which tests later determined to be cocaine. Cook told Hongslo he had purchased the drugs for $20 from the man in the gold truck, but claimed he had purchased the drugs for Brown.

Trevino stopped and searched the gold truck. He found several stacks of money together with bags of crack cocaine.

Cook moved to suppress the evidence and statements obtained during his arrest. In denying the motion, Chief Judge Tatum stated:

"In the case at hand, Officer Hongslo was able to articulate a number of factors to support a reasonable suspicion. Officer Hongslo testified that the area he was observing was a high crime area, known for numerous drug transactions. Officer Hongslo further testified that the defendant's suspicious conduct, the manner in which the defendants made contact, the time of night, the short time Cook was in Bowen's truck, the location where the trucks were parked, and the fact that Officer Hongslo had observed this type of behavior many times while investigating narcotics activity in the same high crime area, were all factors that formed the basis of his reasonable suspicion. Each of these factors taken individually would be insufficient to support a finding of probable cause. However, taken together, under the totality of the circumstances, the Court finds that Officer Hongslo was able to articulate sufficient factors to support a finding of probable cause. Therefore, Officer Hongslo was justified in stopping the vehicle in which Cook was a passenger in order to investigate further his reasonable suspicion that criminal activity had been, was, or was about to occur."

A bench trial followed and Cook was convicted of possession of cocaine. Cook now appeals the denial of his motion to suppress, claiming Hongslo's stop of the blue truck was not based on reasonable suspicion but a mere hunch.

The facts material to the district court's decision on the motion were not in dispute. Hence, we have unlimited review over the legal question whether the district court should have sustained the motion. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

There is no issue about the legitimacy of the search of Brown's truck after it was stopped or the incriminating statements made by Cook. The sole issue is the legitimacy of Hongslo's stop of the blue truck. If it was improper, then the physical evidence found and statements made must be suppressed.

In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the seminal case out of which the police practice of "stop and frisk" has been sanctioned, Officer McFadden, who had many years experience on the Cleveland police force, was assigned an area of downtown to patrol in plain clothes for pickpockets and shoplifters. He observed two men standing on a street corner. One walked down the street, peered into a store window, and then returned to the other man where they conferred for a time. The other man then walked down the street and looked into the same window and returned to the corner where the two men conferred again. This went on about a dozen times. A third man approached and engaged them for a time and then left. The original two men then conferred again and then followed the third man down the street. McFadden suspected the men were casing the store for a robbery, and feared the men might be armed. Thus, he approached them, asked them their names, and patted them down for weapons. Two of the men were carrying revolvers, and they were arrested and charged with possession of a concealed weapon.

The Supreme Court acknowledged that the men engaged in "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." 392 U.S. at 22. Moreover, the court observed: "It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior." 392 U.S. at 23. The Supreme Court concluded that McFadden was exercising a legitimate investigative function when he approached the three men for the purpose of investigating his reasonable suspicion of possible criminal behavior

even though there was no probable cause at the time to make an arrest. 392 U.S. at 30; see also *Illinois v. Wardlow*, 528 U.S. 119, 125, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000), in which the court observed: "All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity."

The ruling in *Terry* has been codified in Kansas in K.S.A. 22-2402(1) which permits an investigatory detention if it is supported by specific and articulable facts which raise a reasonable suspicion the person stopped has committed, is committing, or is about to commit a crime.

Reasonable suspicion is a less demanding standard than probable cause in terms of the quantity and quality of the evidence available to the police. *State v. Parker*, 282 Kan. 584, 147 P.3d 115 (2006). In determining whether reasonable suspicion existed at the time of a stop, we consider the totality of the circumstances, using common sense and ordinary human experience and giving deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances. A police officer's mere hunch will not do. The officer must have a particularized suspicion of wrongdoing. *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993). " 'We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification." ' " *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998); see *State v. Moore*, 283 Kan. 344, 154 P.3d 1 (2007).

Cook's conduct, to an untrained eye, may have raised no suspicion whatsoever or, at most, a mere hunch that something funny was going on. The average citizen of Johnson County, familiar with the scene, more likely would look upon the general area as a popular shopping destination with upscale stores such as Nordstrom's nearby, rather than a center for drug activity. The conduct that justified Officer McFadden's detention of the defendant in *Terry* was not on its face illegal and could have been innocent. Similarly, Cook's conduct could have been entirely innocent. It is certainly

not illegal to engage in a meeting late at night at a gas station. When stopped by Honglso, Brown and Cook each provided different but certainly possible innocent scenarios. One had to do with getting some clothes, the other with getting a job. Conduct that is susceptible of an innocent explanation, such as the explanations Brown and Cook later tried to use on Hongslo, may nevertheless cause an officer, trained in drug enforcement and having a familiarity with the drug history of the area, to harbor a reasonable and specific suspicion of illegal drug activity that needs further investigation.

We cannot improve on Chief Judge Tatum's analysis. In overruling Cook's motion, he cited a multitude of factors from the evidence which, considered together, created a reasonable, articulable, particularized suspicion that Cook had been engaged in a drug transaction, particularly when observed by an officer with Hongslo's training and experience in enforcing drug crimes in this area known for its high incidence of drug transactions. The district court did not err in denying Cook's motion to suppress.

Affirmed.

GREENE, J., dissenting: I respectfully depart from the majority to note that this case may be a high watermark in affirming a finding of reasonable suspicion based solely on the hunch of an officer "with training and experience in enforcing drug crimes" who is working in "a high crime area." I respectfully suggest that, whereas we formerly refused to endorse reasonable suspicion based on a mere hunch, the majority does so in this case because the hunch was that of a "trained and experienced" officer. In other words, a hunch may not support reasonable suspicion, but the hunch of an officer of undefined but adequate training and experience can indeed support reasonable suspicion. My fear is that the majority moves us ever closer to a purely *subjective* test for reasonable suspicion, abandoning the need to rely on *objective* factors.

Analyzing the district court's conclusion, the factors supporting reasonable suspicion can fairly be itemized as follows: (i) high crime area; (ii) defendant's "suspicious conduct" (unexplained by the officer); (iii) the manner in which the defendant made contact (gen-

erally, when individuals in two separate vehicles make contact with each other, one of them exits a vehicle and walks to the other vehicle); (iv) the time of night (11:45 p.m.—the gas stations were open for business, thus demonstrating that normal commerce supports activity at this hour); (v) the duration of time the defendant was in the other vehicle ("short"); and (vi) the training and experience of the officer. *As conceded by the majority, this was conduct that "was not on its face illegal and could have been innocent."* (Emphasis added.) Because the majority has conceded this synthesis of the objective factors, I need not further address their innocence. It was only the "trained eye" of the officer that turned such innocent activity into reasonable suspicion a crime had been committed.

How far will we go with this "trained officer" in a "high crime area" exception to reasonable suspicion based on a hunch? *First,* we should examine the evidence in the record of this officer's "training and experience." I do not intend to demean the credentials of the arresting officer, but the evidence of his experience boils down to this: (i) "been to a couple of street narcotics schools"; (ii) attended the DEA's Operation Pipeline School that "deals with large amount of narcotics that travels on the interstates"; (iii) before being promoted to sergeant, the officer averaged four to five drug arrests per month over a 7-year period; and (iv) the officer was unable to identify the last time he made a drug arrest in this "high crime area." Is this sufficient training and experience? What objective standard shall we employ in making this determination? Is it enough for the officer to have only that training and experience that exceeds that of a reasonable prudent person? What guidance have we offered to district courts to assess this factor? The point is that in relying on the general fact of the officer's "training and experience," the majority has abandoned any anchor in an *objective* standard.

*Second,* we should examine the evidence in the record of the "high crime area." At the outset, of course, it should be acknowledged that mere presence in a high crime area is insufficient to create reasonable suspicion. *Brown v. Texas,* 443 U.S. 47, 52, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); *State v. Anguiano,* 37 Kan.

App. 2d 202, 151 P.3d 857 (2007). More important for the case before us, when pressed about what arrest records might show in the way of drug arrests at the locations in question here, the officer admitted that "if you put in the address of the Texaco and the address of the Phillips 66, *I doubt you are going to get a whole lot of narcotic stuff, because most [of] the arrests are not there.*" (Emphasis added.) Although records were later produced showing actual arrests within a 16 block area including these locations, *the focus must be on the officer's basis for suspicion when he made the stop*; obviously, his belief that few if any arrests had been made at these locations belies *at least to some extent* his reliance on "high crime area" in his formation of reasonable suspicion. Thus, I conclude we have little more than: (i) innocent activity; (ii) in what the officer did not believe was the precise area of frequent drug arrests; (iii) but perceived by him as suspicious because he *used to be* (but no longer is) involved in drug arrests and once attended three seminars having some reference to drug interdiction.

The majority's reliance on *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), is not persuasive. In *Terry*, there was objective evidence of suspicious conduct to support the stop; as related in the Court's opinion:

"[The officer] saw one of the men leave the other one and walk southwest on Huron Road, past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. Then the second man went through the same series of motions, strolling down Huron Road, looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual alternately between five and six times apiece— in all, roughly a dozen trips. At one point, while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation. This man then left the two others and walked west on Euclid Avenue. [The first two men] resumed their measured pacing, peering, and conferring. After this had gone on for 10 to 12 minutes, the two men walked off together, heading west on Euclid Avenue, following the path taken earlier by the third man." 392 U.S. at 6.

I respectfully suggest that this is *not* like what we have before us; comparing the two scenarios, anyone would say the *Terry* facts

appear suspicious (the officer said it appeared they were "casing a job for a stick-up") whereas even the majority concedes that the facts before us—standing alone—appear to be innocent conduct "to an untrained eye." The difference for the majority here was the "training and experience" of the officer. This is where the *objective* standard of *Terry* has been transformed into an unfettered license for liberty deprivation to an officer of requisite "training and experience." The court in *Terry*, however, specified the *objective* test as follows:

"[I]n making that assessment [of reasonableness] it is imperative that the facts be judged against *an objective standard*: would the facts available to the officer at the moment of the seizure or the search 'warrant *a man of reasonable caution* in the belief' that the action taken was appropriate? . . . 'If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." (Emphasis added.) *Terry*, 392 U.S. at 21-22.

This objective standard was reiterated in the case cited by the majority, *Illinois v. Wardlow*, 528 U.S. 119, 125, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000) ("the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior").

Once we endorse a *subjective* standard, based on a rather undefined claim of "training and experience," we vest more power in the officer than we do in a magistrate reviewing an affidavit for probable cause. If the officer has sufficient "training and experience" (whatever that may be), *his* hunch trumps any *objective* factor, and the protection of the Fourth Amendment is eviscerated. Just as the majority has endorsed in this case, where the officer is sufficiently "trained," he or she may stop a citizen involved in what appears to be purely innocent conduct so long as *the officer subjectively* believes that a crime has been, is being, or will be committed.

I concede that the majority's emphasis on the "training and experience" of the officer is not of its own making; even the Court in *Terry* indicated that reasonable action is to be determined by the "specific reasonable inferences" the officer is entitled to draw "in light of his experience." *Terry*, 392 U.S. at 27. Our Supreme

Court has recently emphasized the "officer's capabilities" in endorsing reasonable suspicion. See *State v. Moore*, 283 Kan. 344, 154 P.3d 1 (2007). Nevertheless, I argue that neither the United States Supreme Court in *Terry* nor our Supreme Court in *Moore* ever intended that the officer's "training and experience" should *itself* be a factor in the determination, and it certainly should not be the determinative factor in an otherwise close case. In fact, it is clear from the *Terry* Court's analysis that the court is to make its determination of reasonableness based upon what a "reasonably prudent man would have been warranted in believing" from the specific and articulable facts. *Terry*, 392 U.S. at 28. And our Supreme Court has oft embraced this standard, stating " ' "we judge the officer's conduct in light of common sense and ordinary human experience." ' " *Moore*, 283 Kan. at 354. I contend we should be vigilant in maintaining this *objective* criteria and assure that our deference to an officer's training not eclipse the centrality of an objective standard.

Let me make clear the slippery slope upon which the majority would launch our reasonable suspicion analyses: so long as the officer effecting the stop is sufficiently trained and experienced, his affirmative statement that he alone perceived that a crime had been, was being, or would be committed is sufficient to support reasonable suspicion for purposes of the Fourth Amendment to the United States Constitution, even if the objective facts would appear to reflect totally innocent conduct to a reasonable prudent person. I truly fear that this development will serve to license unbridled deprivation of the comprehensive right of personal liberty intended to be protected by the Fourth Amendment.

I respectfully dissent and would reverse the district court's denial of Cook's suppression motion.